1   FRANKLIN H. WRIGHT
    1001 Polk St.
2   San Francisco, CA 94109
    frank.wright9@gmail.com
3   Ph: 415.748.4382

4

5                    UNITED STATES DISTRICT COURT

6                   NORTHERN DISTRICT OF CALIFORNIA

7                      SAN FRANCISCO DIVISION

8                                              C V 14 5525

9   FRANKLIN H. WRIGHT,              )    Case No.
            Plaintiff,               )
10                                   )    DECLARATION OF
                                     )    FRANKLIN H. WRIGHT;
11  v.                               )    COMPLAINT
                                     )
12  POPS MCGOVERN, as individual and as agent of )
    UNITED STATES;                   )
13  HUGHES, SOCOL, PIERS, RESNICK, & DYM, LTD; )
    BERGER SHATZ; BREEN, PUGH & ASSOCIATES; )
14  MR. TODD PUGH; MR. THOMAS S. BREEN; )
    UNIVERSITY OF CHICAGO; SIX UNNAMED )
15  PROFESSORS AND STUDENTS AT UNIVERSITY )
    OF CHICAGO; MR. EDWARD A. SNYDER; )
16  MR. FRED ALVAREZ; WILSON, SONSINI, )
    GOODRICH, & ROSATI, P.C.; MR. JEFFREY )
17  WHITEHEAD; MR. MICHAEL BOSKIN; )
    MR. DANIEL WATERS; WATERS LAW )
18  LLC; UNITED STATES OF AMERICA; )
            Defendants.              )
19                                   )
                                     )
20                                   )
                                     )
21  _____ )

22  //

23

24

25

26

27

28

    Case No. _____U.S.D.C. N.D. Cal.                    Page 1 of 96
    Complaint

# Contents

SUPPORTING DECLARATION & NOTICE .................................................... 4

I.     TABLE OF AUTHORITIES ........................................................ 5
II.    INTRODUCTION ........................................................................ 15
III.   RELEVANT CASE BACKGROUND TO DATE ................. 16
IV.   VENUE & JURISDICTION ..................................................... 18

V.    STATUTE OF LIMITATIONS ............................................... 20
Contracts - Ohio ...................................................................................... 22

Tolling .......................................................................................................... 22

VI.   CLAIMS IN SUPPORT OF A CAUSE OF ACTION ...... 27

VII.  FACTS AND LAW IN SUPPORT OF CAUSE(S) OF ACTION ... 29
Fiduciary Case Law – California, Illinois, Ohio ................................... 29

Fraudulent Concealment – Illinois ......................................................... 32

Hughes & Berger Shatz - Illinois ........................................................... 33

Mr. Thomas Breen & Mr. Todd Pugh - Illinois ................................. 38

Mr. Fred Alvarez - California .................................................................. 46

University of Chicago - Illinois .............................................................. 49

Mr. Edward A. Snyder - Illinois ............................................................ 53

Mr. Jeffrey A. Whitehead & W.S.G.R., P.C. – Illinois & California ... 55

Wilson, Sonsini, Goodrich & Rosati, P.C. - California ...................... 58

Pops McGovern (alias) – Ohio ............................................................... 59

Mr. Daniel Waters – Ohio ........................................................................ 62

Consolidated Claim – all named Entities and Individuals ................. 63

VIII. UNIVERSITY OF CHICAGO PROFESSORS & STUDENTS ... 64
Overview ..................................................................................................... 64

Prof. David Altig ....................................................................................... 64

Prof. Linda Darragh ................................................................................. 65

Prof. Abroo ............................................................................................................. 66

Investments ........................................................................................................... 67

Evaluation, Intent, Effect & Lessons Learned .................................................... 67

Theoretical Interpretation .................................................................................... 71

**IX.    DAMAGES**                                                                                   **73**
Endured Life Harm ............................................................................................... 73

Breach of Fiduciary Duty ..................................................................................... 73

Breach of Contract – Ohio .................................................................................... 74

Breach of Contract - California ............................................................................ 75

Breach of Contract - Illinois ................................................................................ 77

Tort – Illinois ........................................................................................................ 77

Defamation – California ........................................................................................ 79

**X.    RELIEF REQUEST(S)**                                                                          **81**
Suggested Two-Stage Relief Process .................................................................... 81

Suggested Relief – Stage 1 ................................................................................... 81

Preliminary Relief Requests – Stage 2 ................................................................ 82

**XI.    CONCLUSION**                                                                                 **92**
Social Entrepreneurship, Economics, and the U of C .......................................... 92

A Message to the Court ......................................................................................... 92

Hannah and the Farmer's Market ......................................................................... 93

**XII.    REQUEST(S) FOR JUDICIAL NOTICE**                                                           **94**

**EXHIBITS**                                                                                          **95**

1

**SUPPORTING DECLARATION & NOTICE**

2
I, *Franklin H. Wright*, declare:

3

4
1. <u>**I submit that the aforementioned filing and related exhibits are truthful and accurate and if called to testify, could and would competently testify thereto.**</u>

5

6
2. <u>**This complaint often references timeframes using the abbreviation for circa and applies specifically to timeframes Plaintiff recalls, but applies a (+/- 6 months) to his recollection.**</u>

7

8

9
3. <u>**I have submitted approx. 200 claims in approx. 30 different letters pursuant to California's Government Claims Act and the F.T.C.A. including claims against Judges, Clerks, and ancillary members of the Federal Phillip C. Burton and James R. Browning Courthouse's Staff.**</u>

10

11
4. Approx. 25% of the citations listed have been validated for accuracy in the final editing cycle.

12

13
I declare under penalty of perjury under the United States of America that the foregoing is true and correct.

14

15
__see ECF datestamp__(date) 12/16/2014

16
                                    ____/s/ Franklin H. Wright____

17
                                    Franklin H. Wright

18

19

20

21

22

23

24

25

26

27

28

# I.  TABLE OF AUTHORITIES

<u>Statute</u>

28 U.S.C. Sec. 1332 (Diversity Jurisdiction)……………………..…………………………………….18

28 U.S.C. § 1367 (Supplemental Jurisdiction)…...……………………………………………….18

28 U.S.C. § 1391(b)(2) (Jurisdiction)……………………………..…..………………………..18

28 U.S.C. § 1652 (Apply Law in State where Court Sits)……………………...…………………18

28 U.S.C. § 1331 (Original Jurisdiction)………………………………………………………19

28 U.S.C. § 1404 (Venue Change)……………………………………………………………19

Art. III (U.S. Const.) (Fed. Judicial Power)…………………………………………..…………19

735 ILCS 5/13-215 (Statute of Limitations, Fraudulent Concealment, 5 yrs.)…..……….. 23, 25, 41, 58

735 ILCS 5/13-214.3 (Statute of Limitations, Attorneys, 2 yrs.)……..………………..………21, 25, 33

Ohio UCC 2305.6 (Statute of Limitations, Contracts, 8 years)…………………………………….22

Ohio UCC 2-725, 1302.98 (Contracts)…………………………………………...…22, 51

Cal. Civ. Code § 1714.10 (Civil Conspiracy, Attorneys)……………………..………………...27-29

Cal. B&PC § 6068 (Attorney Duties)……………………...……………………………………...28, 47

11 U.S.C.A. § 704(a)(4) (Bankruptcy Trustees)………………………………...……...……32, 56

11 U.S.C.A. § 323(b) (Bankruptcy Trustees)………………………………………....…32, 56

14th Amend. (U.S. Const.)…………………………………………………………...……33

735 ILCS 5/13-206 (Limitations, Written Contracts, 10 yrs.)……...………………..…34, 38, 50, 51, 55

735 ILCS 5/13-205 (Limitations, Contracts, 5 yrs.)……..…………………………21, 34, 41, 55, 58

750 ILCS 5/401(a)(2) (Mandatory Two Year Waiting Timeframe)………………………..……35, 37

Article VIII, Illinois' Rules of Professional Conduct (Attorney Duties)………………………..41, 46

6th Amend. (U.S. Const.)…………………………………………………………………...28, 41

1

8th Amend. (U.S. Const.)...................................................................44

2

Cal. Civ. Code § 45 & § 45a (Defamation, Innuendo)..........................46, 52, 53

3

810 Ill. Comp. Stat. 5/2-725 (Contract Limitations, Sale of Goods)......................51

4

Cal. Civ. Code Sec. 3300 (Contract Damages)..........................................75

5

6

Civil Code § 3301 (Contract Damages)...................................................73

7

Civ. Code Sec. 3358 (Contract Damages)................................................75

8

CC Sec. 3287(a) (Contract, Right to Damages if Calculable)............................76

9

CC Sec. 3289 (Damage Interest, 10%)...............................................76, 87

10

Cal. Civ. Code §3294(a) (Punitive, Oppression, Fraud, Malice)........................76

11

12

810 ILCS 5/2-601 (Contract Damages, Illinois)........................................77

13

810 ILCS 5/2-715 (Contract Damages, Illinois)........................................77

14

Cal. Civ. Code §48(4)(a) (Defamation Damages)..................................79, 80

15

810 ILCS 5/2-716 (Specific Performance of Contract)............................82, 85

16

//

17

18

19

20

21

22

23

24

25

26

27

28

1   <u>Case Law</u>

2   *Alameda v. Secretary of Health, Education, and Welfare*, C.A.1 (Puerto Rico, 1980)

3   622 F.2d 1044 (Quantity, Quality and Rule 8)..............................................................15

4   *Swartz v. Oracle Corporation, et. al* (N.D.Oh. 2011)
  F.Supp.2d 686 (Business Performance).............................................................16, 48, 86

5

6   *Wright v. Stanford* (N.D. Cal. 2013)
  3:13-CV-04457-EMC (Requests for Legal Asst.)......................................................16, 47

7
  *Exchange Nat. Bank of Chicago v. Touche Ross & Co.* (C.A.2, N.Y. 1976)
8   544 F.2d 1126 (Subj. Matter Jurisdiction; Evidence and Pleadings)....................................18

9   *Harris v. Totten* (S.D.N.Y. 2003)
  406 F.Supp.2d 346 (Subj. Matter Jurisdiction; Evidence and Pleadings)................................19
10

11   *Ankenbrandt v. Richards* (1992)
  504 U.S. 689, 695-697 (Art. III, U.S. Const.)...........................................................19
12

13   *U.S. v. Kubrick* (1977)
  435 F.Supp. 166, 180 (Statute of Limitations)...........................................................20
14

  *Bridgford v. United States* (4th Cir. 1977)
15   550 F.2d 978, 981 (Statute of Limitations)..............................................................20

16   *Ciccarone v. United States* (3d Cir. 1973)
  486 F.2d 253, 256 (Statute of Limitations)..............................................................20
17

18   *Tyminski v. United States* (1973)
  481 F.2d 257 (Statute of Limitations).....................................................................20
19

20   *Quinton v. United States* (5th Cir. 1962)
  304 F.2 234, 240 (Statute of Limitations)................................................................20
21

  *Scheuer v. Rhodes* (1974)
22   416 U.S. 232 (Rights to Discovery).......................................................................21

23   *Clark v. Robert W. Baird Co.* (N.D. Ill. 2001)
24   142 F. Supp. 2d 1065, 1074–75 citing 735 Ill. Comp. Stat. 5/13-205 (Statute of Limits)..............21

25   *Hermitage Corp. v. Contractors Adjustment Co.* (Ill. 1995)
  166 Ill. 2d 72, 77 (Statute of Limits)....................................................................21
26

27   *Schreiber v. Hackett* (Ill. App. Ct. 1988)
  173 Ill. App. 3d 129, 131 (Statute of Limits)............................................................21
28

1
2
*Clay v. Kuhl* (Ill. 2000)
727 N.E.2d 217 at 223 (Discovery Rule, Tolling)……………………………….............23

3
*Knox College v. Celotex Corp.* (1981)
4
88 Ill.2d 407 (Discovery Rule, Tolling)……………………...………………………….23

*Nolan v. Johns-Manville Asbestos* (1981)
5
85 Ill.2d 161, 171, 52 Ill.Dec. 1, 421 N.E.2d 864 (Tolling)…………………...………….23

6
*Witherell v. Weimer* (1981)
7
85 Ill.2d 146, 156, 52 Ill.Dec.6, 421 N.E.2d 869 (Tolling)……………...……………….23

8
*Joseph A. Ruth v. The Paul Revere Life Ins. Co.* (N.D. Ill. Sept. 2, 2010)
*No. 08 C 50102, 2010 WL 3527561, at \*2* (Tolling)………...……………...………………23
9

10
*Grant v. McAuliffe* (1953)
41 Cal.2d 859, 264 P.2d 944 (Out of State and Tolling)…………………………………….24
11

*Barbara A. v. John G.* (1983)
12
145 Cal.App.3d, 369, 383 (Fiduciary Duties)…………………………………………….29

13
*Cox v. Delmas* (1893)
14
99 Cal.Rptr. 104, 123 [28 P. 687] (Fiduciary Duties)………………………….……………29

15
*Rader v. Thrasher* (1962)
16
57 Cal. 2d 244, 250 [18 Cal.Rptr. 736, 368 P.2d 360] (Fiduciary Duties)….…………………29

17
*Sanguinetti v. Rossen* (1906) 12 Cal.App. 623, 630 [107 P. 560]
18
citing 1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, §§ 47-54, pp. 55-62………………….29

19
*Doherty v. American Motors Corp.* 728 F2d 334, 339 (6th Cir. 1984) quoting *Nelson Radio & Supply Co v Motorola*, 200 F2d 911, 914 (5th Cir 1952), cert denied, 345 US 925 (1953) (Conspiracy)…...29
20

21
*State ex rel. Charlton v. Corrigan* (1988) 36 Ohio St.3d 68, 71 (1988)
quoting *In re Termination of Employment*, 40 Ohio St.2d at 114 (Fiduciary Duties)….…….......30
22

23
*Charlton v. Corrigan* (1988)
36 Ohio St.3d 68, 521 N.E.2d 804 (1988) (Fiduciary Duties)….……………………..............30

24
*Cutler v. State Bar* (1969) 7
25
1 Cal. 2d 241, 252 [59 Cal.Rptr. 425, 428 P.2d 289] (Fiduciary Duties)….…………………….30

26
*McKinney v. State Bar* (1964)
62 Cal. 2d 194, 196 [41 Cal.Rptr. 665, 397 P.2d 425]; cf. Bus. & Prof. Code, § 6106………..…30
27

28

*McFail v. Braden (1960)*
19 Ill.2d 108, 166 N.E.2d 46, 51 – 52 (Fiduciary Duties)...……………………….......30, 53

*Collins v. Nugent* (1st Dist. 1982)
110 Ill.App.3d 1026, 443 N.E.2d 277, 66 Ill.Dec. 594 (Fiduciary Duties)...……………….....30

*In re Estate of Wernick* (1st Dist. 1986)
151 Ill.App.3d 234, 502 N.E.2d 1146, 104 Ill.Dec. 486 (Fiduciary Duties)...…………………....31

*In re Estate of Long* (4th Dist. 2000)
311 Ill.App.3d 959, 726 N.E.2d 187, 244 Ill.Dec. 591 (Fiduciary Duties)...…………..…………....31

*Ransom v. A.B. Dick Co.* (1st Dist. 1997).
289 Ill.App.3d 663, 682 N.E.2d 314, 322, 224 Ill.Dec. 753 (Fiduciary Duties)...……………….......31

*Lemp v. Hauptmann* (5th Dist. 1988).
170 Ill.App.3d 753, 525 N.E.2d 203, 121 Ill.Dec. 397 (Fiduciary Duties)...…………….…….......31

*Richelle L. v. Roman Catholic Archbishop*
106 Cal.App.4th 257 (Fiduciary Duties)...……………………………………………….............31

*Pierce v. Lyman* (1991)
1 Cal.App.4th 1093, 1101 (Fiduciary Duties)...………………..…………….…….............31, 58

*Matter of Topco, Inc.* (1990)
894 F.2d 727, 728 [n. 16] (Fiduciary Duties)...…………..…………...……………...............31

*Chatham Surgicore, Ltd. v. Health Care Service Corp.* (1st Dist. 2005) 356 Ill. App. 3d 795, 803, 826
N.E. 2d 970, 977 citing *Hirsch v. Feuer* (1998) 299 Ill.App.3d 1076, 1085 (Fraud. Conceal.)....32, 43

*FE Digital Investments Ltd. v. Hale* (N.D. Ill. 2007)
499 F. Supp 2d 1054, 1061 (Fraudulent Concealment)...………………………………............32

*Janowiak v. Tiesi* (1st Dist. 2010)
402 Ill. App. 3d 997, 1006, 932 N.E.2d 569, 579 (Fraudulent Concealment)……..……...............32

*Federal Signal Corp. v. Thorn Automated Sys., Inc.* (Ill. App. Ct. 1998).
295 Ill. App. 3d 762, 765–66 (Tortious Interference)……………………………...…………..41, 57

*McKinney v. County of Santa Clara* (1980)
110 Cal.App.3d 792, 796-799 (Republication, Defamation)…………………..….………..43, 45, 52

*Raethz v. Aurora Univ.* (2d Dist. 2004)
346 Ill.App.3d 728, 732 (Universities, Breach of Contract)………………………...………….51

//

*Van Der Molen v. Wash. Mut. Fin., Inc.* (1st Dist. 2005)
359 Ill.App.3d 813, 823 (Contract, Illinois)……………………………………….50

*Moore v. Greene* C.A.9 (Cal. 1970)
431 F.2d 584 (Libel)………………………………………………………………52

*Smith v. Maldonado* (App. 1 Dist. 1999)
85 Cal.Rptr.2d 397, 72 Cal.App.4th 637 (Tort of Defamation)……..……………………52

*In re: Edgewater Medical Center* (2006)
344 B.R. 864 (Contract and Tort Claims on same facts)……………………………………54

*Masi v. Ford City Bank and Trust Co.* (7 Cir. 1985)
779 F.2d 397 (Contract and Tort Claims on same facts)…………………..……………54, 77, 78, 85

*Seerveld v. Gerstenberg & Co.,* 1986 U.S. Dist. LEXIS 290971986 WL2609 (N.D. Ill.)
(Contract and Tort Claims on same facts)……………………………………………………54

*Lal v. Naffah* (1st Dist 1986)
149 Ill.App.3d 245, 500 N.E.2d 699, 792; 102 Ill.Dec. 806 (Contracts)…..……………………55

*Bull v. Mitchell* (3d Dist.1983)
114 Ill.App.3d 177, 448 N.E.2d 1016, 1023; 70 Ill.Dec. 138 (Implied Contracts)…………………55

*Lampe v. Swan Corp.* (5th Dist.1991).
212 Ill.App.3d 414, 415; 571 N.E.2d 245, 246; 156 Ill.Dec. 658, 659 (Implied Contracts)……..……55

*In Re Estate of Brumshagen* (2d Dist.1960)
27 Ill.App.2d 14, 169 N.E.2d 112, 116 (Implied Contracts)……………..……………………55

*Dallis v. Don Cunningham and Associates* (7th Cir.1993)
11 F.3d 713, 716 (Implied Contracts)………………………………………………………...55

*Gray v. Sutherland* (1954)
124 Cal. App. 2d 280, 290 [268 P.2d 754] (Third Party Accountability)…………………………58

*Bancroft-Whitney Co. v. Glen* (1966)
64 Cal. 2d 327, 353 [49 Cal.Rptr. 825, 411 P.2d 921, 24 A.L.R.3d 795] (Fiduciary)………………58

*United States v. Scrap Metal Cos.* (2004, 2008 N.D. Ohio)
Case Nos. 08-CR-068 and 04-CR-030……………………………………………………61

*Lebo v. IMPAC FUNDING CORP., et al.* (N.D. Ohio, 2011); No. 11-01857 citing *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006) (Breach of Contract Elements)………..……………63

//

*Van de Kamp v. Bank of America*
204 Cal.App.3d 819, 863 citing Cal. Civil Code §3333 (Damages, Fiduciary)....................73

*Michelson v. Hamada* (1994)
29.Cal.App.4th 1566, 1582 (Damages, Fiduciary).................................................74

*Kirschner Brothers Oil, Inc. v. Natomas Co.* (1986)
185.Cal.App.3rd 784, 790 (Damages, Fiduciary)..................................................74

*Stuart v. Continental Illinois National Bank & Trust Company of Chicago* (1977)
68 Ill.2d 502, 369 N.E.2d 1262, 1272, (1977) (Damages, Fiduciary)........................74

*Parish v. Parish* (1963)
29 Ill.2d 141, 193 N.E.2d 761, 766 (Damages, Fiduciary)....................................74

*Jones v. Hryn Development, Inc.* (1st Dist. 2002) 334 Ill.App.3d 413, 778 N.E.2d 245 citing *Finley v. Finley* (1980) 81 Ill.2d 317, 410 N.E.2d 12, 19, 43 Ill.Dec. 12 (Damages, Fiduciary)..............74

*Pasadena Live LLC v. City of Pasadena* (2004)
114 C.A.4th 1089 (Damages, Contract)............................................................75

*Robinson Helicopter v. Dana Corp.* (2004)
34 CA4th 979 (Independent Claims on Same Facts)..............................................75

*Hunt Bros. v. San Lorenzo Water Co.* (1906)
150 C 51 (Contract Damages)......................................................................75

*Millikan v. American Spectrum Real Estate Servs.* (2004)
117 CA4th 1094, 1104 (Contract Damages).......................................................75

*Sun Maid Raisin Growers v. Victor Packing Co.* (1983)
146 CA3d 787 (Contract Damages).................................................................75

*Buxbom v. Smith* (1994)
23 C2d 535 (Lost Profits)...........................................................................76

*Sargon Enters., Inc. v. University of S. Cal.* (2012)
55 C4th 747, 773 (Lost Profits).....................................................................76

*City of Hope Nat'l Med. Ctr. V. Genentech, Inc.* (2008)
43 C4th 375, 392 (Plaintiff Entitlement, Punitive Damages)....................................76

*Cates Constr., Inc. v. Talbot Partners* (1999)
21 C4th 28, 61 (Plaintiff Entitlement, Punitive Damages).......................................76

//

Case No. _____ U.S.D.C. N.D. Cal.
Complaint

*Freeman & Mills, Inc. v. Belcher Oil Co.* (1995)
11 C4th 85, 102 (Plaintiff Entitlement, Punitive Damages)…………………....…….……76

*Johnson v. Comptoir* (1955)
135 CA2d 683 (Plaintiff's Requirement to Mitigate)……………………………………….76

*Millikan v. American Real Estate Servs. Cal., Inc.* (2004)
117 CA4th, 1094, 1105] (Right to Costs Obtained for Mitigation)………………………….76

*Consolidated Coal Co. v. Haenni* (1893)
146 Ill.614, 35 N.E. 162 (Tort Damages, Illinois)……………………………………..….78

*Eshelman v. Rawalt* (1921)
298 Ill. 192, 197, 131 N.E. 675 (Tort Damages, Illinois)………………………………….78

*Knierim v. Izzo* (1961)
22 Ill.2d 73, 87, 174 N.E.2d 157 (Tort Damages, Illinois)…………………………....…….78

*Allabastro v. Cummins* (1980)
45 Ill.Dec. at 756, 413 N.E.2d, at 89 (Tort Damages, Illinois)………………………………78

*MacLeod v. Tribune Publishing Co.* (1959)
52 Cal.2d 536, 547 (Damages)………………………………………………………….79

*Couch v. San Juan Unified School District* (1995)
33 Cal.App.4th 1491, 1500 (Damages)………………………………………………….79

*Douglas v. Janis* (1974)
43 Cal.App.3d 931, 940 (Tort Damages)…………………………....………………….…79

*Agarwal v. Johnson* (1979)
25C3d 932, 947 (Punitive, Tort)…………………………....…………………………….79

*Schomer v. Smidt* (1980)
113 CA3d 828, 836 (Punitive Damages; Purpose of Punishing Wrongdoer)………………......80

*Kuge v. O'Gara* (1964)
227 CA2d 207, 209 (Punitive, Tort)………………………………………………….80

*Molybdenum Corp. of America v. Kasey* (Cal. App. 1959) 1 Cal.Rptr. 400 citing *Division of Labor L. Enforcement v. Safeway Stores* (1950) 96 Cal.App.2d 481, 490 [3] [215 P.2d 773]…....………..85

*Douglas v. Janis* (1974)
43 Cal. App. 3d 935 (Defamation Damage Amt. Precedent at 2% Inflation)…………...………….87

//

1

<u>Other Relevant Sources</u>

2

Supreme Court Rules 5.1 and 13.1……………………………………………………...…..16

3

*Illinois Statute of Limitations Checklist, http://www.kelleydrye.com/index*

4

Practical Law Company, Litigation & ADR web publication...………………………….......22-25

5

CCP Sec. 351 (Out of State and Tolling)…………………………………………………….23

6

Black's Law Dictionary (10th Ed.)………………………………………………….22, 58

7

Frankel, Fiduciary Law (1983) 71 Cal.L.Rev. 795……………………………………….31

8

U.S. Dept. of Justice Website (Bankruptcy Trustees)................................................32, n.12

9

*Online Journal of the DuPage County Bar Association*……………………………………...36

10

California CEB's *California Tort Damages*, Second Ed………………………….……§ on Damages

11

Legal Information Institute (Cornell University)

12

http://www.law.cornell.edu...............................................................................................All

13

State of Illinois Jury Instructions

14

Sec. 700.00 and 800.00……………………………………………………………Throughout

15

FRCP 8(b)(1)(B) & Rule 8(b)(6) (Allegations not Denied are Admitted)……………..…….48, 60, 86

16

W. Prosser, Handbook of the Law of Torts §46 and W. Keeton, Prosser and Keeton on the

17

Law of Torts §46………………………………………………...………………………...…….62

18

*California Federal Civil Procedure Before Trial*, The Rutter Group (2014), Ch. 11……………….69

19

*Cincinnati Bar Association*, http://www.cincybar.org.........................................................74

20

Sanford, Libel and Privacy (2d ed 1991)…………………………………………………….79

21

State of California Bar Association's *California Attorney's Guide to Damages*………....…………71-78

22

Fed. Rule Civ. Proc. 16 and 26……………………………...….…………………………..81

23

Wikipedia……………………………………………………………………...……….Various

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*PAGE INTENTIONALLY LEFT BLANK*

## II. INTRODUCTION

The complaint herein seeks to accomplish the following objectives:

1) Assert claims against defendants identified from 2013-2014 legal research and from dismissed claims asserted in an amended complaint (Case No. 14-00353-RS, U.S.D.C., N.D. Cal.);

2) Group claims asserted into logical management areas (i.e. – by claim type; by defendant type; by location and timeframe; by conspiring parties);

3) Pray for rapid and reasonable remedy under the doctrine of "for every legal wrong, there is remedy";

4) Balance FRCP Rule 8 with guidance inferred from *Alameda*[1] regarding the Courts desire for accuracy and thoroughness while preferring brevity;

5) Protect Plaintiff from lack of knowledge (i.e. – expected relief amount, options for remedy);

6) Inform defendants of work to date for hopes of reasonable remedy.

Plaintiff will utilize the following abbreviations: for Wilson, Sonsini, Goodrich, & Rosati, P.C., "W.S.G.R."; for the firm formerly known as Breen, Pugh and Associates or its former or current firm entity names, "Breen, Pugh" or "Breen & Pugh"; for Berger Shatz, "Berger"; and other abbreviations as may be contextually understood.

//

//

---

[1] After entry of default against government, quantum and quality of evidence that might satisfy court can be less than that normally required. *Alameda v. Secretary of Health, Education, and Welfare*, C.A.1 (Puerto Rico) 1980, 622 F.2d 1044 (quotations omitted). Plaintiff has inferred that the words "quantum and quality" suggest Federal Courts desire both quality and thoroughness in order to satisfy the Court. 80 pages of facts and citations in support seem sufficient to proceed to disclosure and discovery.

## III. RELEVANT CASE BACKGROUND TO DATE

Plaintiff has been carrying several claims against former employers that could have been discovered via reasonable effort by attorneys Plaintiff hired or by fiduciaries Plaintiff retained beginning with a divorce that occurred in 2006. Claimant suggests that Illinois statutes (subject to California's long arm statute) are operative for many of the claims herein as some of the individuals or entities resided in the Greater Chicago area of Illinois at the time the incidents occurred.

Due to breaches by those people and entities, Plaintiff had no other option than to file his own lawsuits while residing in a homeless shelter in Akron, Ohio c. 2010-2011 in order to seek remedy. Entities within this suit were dismissed without prejudice in that suit (see *Swartz v. Oracle Corporation, et. al* (N.D. Oh. 2011), F.Supp.2d at 686, see ECF Doc #16-1) and include Hughes; Berger Shatz; and Breen, Pugh & Associates [the firm now seemingly conducts business as "Breen & Pugh"].

In addition, from Feb. 2013 to August 2013, Plaintiff retained Mr. Daniel Waters of Waters Law LLC to repair credit and a few inaccuracies on his credit report.

An August, 2013 review of Plaintiff's Ohio (U.S.D.C., N.D. Ohio; Eastern Division) lawsuits and appeals uncovered what appeared to be conflicts between Supreme Court Rule 5.1 and Rule 13.1. Those discoveries caused Plaintiff to drive to California in September of 2013 in search of assistance from a school that had previously invited him to meet.

He sought help directly from Ms. Magill, the Dean of Stanford University's Law School.

On or about Sept. 26th, 2013, Plaintiff filed an action against Stanford University in U.S.D.C. N.D. Cal for tort claims relating to his requests for assistance. See *Wright v. Stanford* (N.D. Cal. 2013), Case No. 3:13-CV-04457-EMC. The action was dismissed and appealed to the Ninth Circuit. The matter's final judgment was filed by the Circuit Court c. May, 2014.

On or about January 23rd, 2014, Plaintiff filed an action against the U.S. Interagency Council on Homelessness ("U.S.I.C.H.") regarding homelessness he has experienced which spanned two specific regions – Akron, Ohio and San Francisco, CA.  In that related action, Plaintiff included several claims against defendants named herein (see ECF Doc #56, Case No. 14-00353-RS), but those claims were dismissed with leave to amend.

These consolidated actions are linked – in other words, breaches by one party led to torts endured by Plaintiff at a later date.  For a partial summary of Plaintiff's interconnected complaints (cause and effect diagrams), Plaintiff supplies the following visual:

### Figure #1 – Plaintiff's Former Attorneys & Mr. Edward A. Snyder as Fiduciaries



### Figure #2 – Interconnectivity of Claims and Sustained Damages



## IV.    VENUE & JURISDICTION

Plaintiff had no physical address in California until October 4th, 2013 when he was assigned a homeless shelter (ECS Next Door's homeless facility) for 3 months.  As of this filing, Plaintiff resides in that homeless shelter.

Under 28 U.S.C. § 1652, "The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply."

Pursuant to 28 U.S.C. Sec. 1332, "The district courts shall have diversity jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between…citizens of different States…"

28 U.S.C. § 1367 states:

"(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy…Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

Pursuant to 28 U.S.C. § 1391(b)(2), "A civil action may be brought in a judicial district in which a substantial part of the events…giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated…"    Considering many of the claims herein stem from claims against companies headquartered in the Bay Area, California from 2000 to 2008, venue in U.S.D.C., N.D. Cal. is also proper.

1    Pending discovery and additional assertions under R.I.C.O.; jurisdiction of this court is also

2    invoked under 28 U.S.C. § 1331, which states the "district courts shall have original jurisdiction of all

3    civil actions under the Constitution, laws, or treaties of the United States."

4    Based on the locations of many of the claims asserted within and the convenience of

5    defendants, Plaintiff actually believes this action is best filed in U.S.D.C., N.D. Illinois.   However,

6    due to indigence, homelessness, and several other extenuating factors, filing in that location is not

7

8    feasible.

9    Pursuant to 28 U.S.C. § 1404[2], Plaintiff is not opposed to a change in venue (Chicago, IL)

10    pending logistical remedy (Plaintiff files as an indigent, resides in a homeless shelter, it is winter, and

11    he can't obtain transportation to other districts).    In other words, if the University of Chicago reads

12

13    the attached and says "he's correct", then Plaintiff may find residence at the University, stipulate

14    rapid remedy, and thus solve current logistical difficulty while removing one named defendant.

15    Plaintiff resided in Chicago, IL from 1998 to 2009, save a departure from 2006 to 2007.

16                                    Subject Matter Jurisdiction

17    "On...subject matter jurisdiction[3], district court could consider factual statements in

18

19    plaintiff's affidavits as well as the pleadings."  *Exchange Nat. Bank of Chicago v. Touche Ross &*

20    *Co.* C.A.2 (N.Y.) 1976, 544 F.2d 1126. See also *Harris v. Totten* (S.D.N.Y. 2003) 406 F.Supp.2d

21    346.

22    As such, Plaintiff directs the Court to referenced exhibits and relevantly noticed cases.

23    //

24

25    //

---

26    [2] (a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.

27    [3] Federal judicial power derives from Article III, §2 of the U.S. Constitution. "This section delineates the absolute limits on the federal courts' jurisdiction." *Ankenbrandt v. Richards* (1992) 504 U.S. 689, 695-697. Art. III, U.S. Const. includes

28    "...Controversies to which the United States shall be a Party..." Thus, this action is properly placed.

## V. STATUTE OF LIMITATIONS

"The District Court conceded that the lower federal courts had held with considerable

uniformity that a claim accrues...when 'the claimant has discovered, or in the exercise of reasonable

diligence should have discovered,' the acts constituting the...[wrongdoing][4]...and that notice of the

injury and its cause normally were sufficient to trigger the limitations period." *U.S. v. Kubrick*

(1977) 435 F.Supp. 166, 180.[5]

Plaintiff interprets the meaning of the citation and its subsequent lesson to mean that a tort

claim's accrual date would not become active until after claimant became aware or should have

become aware - via diligent and reasonable effort - that a tort had occurred to him by a particular

party.   In this matter, claimant was not aware that harm was done to him until well after the harm

occurred.   There were three particular timeframes Plaintiff performed investigation and research

relating to claims he maintained:

(1) Between May, 2008 and c. May, 2009 – via communication with Mr. Fred Alvarez

(formerly of W.S.G.R., now of Jones Day) as well as communication with former

business professors, Deans, and law professors at University of Chicago.  This research

was mostly related to claims Plaintiff maintained against BroadVision from 2004-05;

(2) In 2009 and 2010 relating to Plaintiff's Bankruptcy (N.D. Ill.).  This research was

conducted relating to Plaintiff's former employers; the University of Chicago; Mr. Breen

and Mr. Pugh [Dec. 29th, 2010; Case No. No. 2010-128241, Summit County, Ohio];

---

[4] Plaintiff is substituting "wrongdoing" for "malpractice."

[5] Further "The test which has been articulated, with considerable uniformity, to determine 'when a claim accrues' is to ascertain the point in time at which the claimant has discovered, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice."  See *Bridgford v. United States*, 550 F.2d 978, 981 (4th Cir. 1977); *Ciccarone v. United States*, 486 F.2d 253, 256 (3d Cir. 1973); *Tyminski v. United States*, supra, at 263;  *Quinton v. United States*, 304 F.2 234, 240 (5th Cir. 1962). Also "...while the premise of Quinton is that knowledge...is generally sufficient to alert a reasonable person that there may have been negligence..., this presumption of sufficiency cannot be...an irrebuttable one; that the exception often proves the rule; and that Quinton must be applied on an ad hoc basis in each case. *Kubrick* at 184.

(3) From Sept. 2013 to present as per research conducted in California (the balance of claims including those asserted against his bankruptcy attorney).

It was only during these timeframes Plaintiff discovered various defendants' accountability for claims he maintained [i.e. - a breach of fiduciary duty against the U.S. Dept. of Justice regarding his bankruptcy, see Case No. 14-00353-RS, ECF Docs #56 & #79; defamation claims against University of Chicago under republication principles]. The process of Discovery, or admission by defendants as to involvement and intent thereto would be required as to what actually occurred (via affidavits, depositions, testimony, etc…).

On that basis alone, dismissal at the pleading stage of this action is improper. See *Scheuer v. Rhodes* (1974) 416 U.S. 232[6].

The statute of limitations for a cause of action for breach of fiduciary duty against attorneys is two years after discovery of the cause of action in Illinois [5 years for fraudulent concealment, see 735 ILCS 5/13-215[7]; 2 years for tort or contract[8] actions against attorneys, see 5/13-214.3].

Other claims are due within 5 years of the accrual date. See *Clark v. Robert W. Baird Co.* (N.D. Ill. 2001), 142 F. Supp. 2d 1065, 1074–75 (citing 735 Ill. Comp. Stat. 5/13-205[9] (2010)).

---

[6] In *Scheuer*, a 1974 unanimous opinion of the United States Supreme Court, the Court stated: "When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.*" *Id.* at 236 (emphasis added).
[7] If a person liable to an action fraudulently conceals the cause…from the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause…
[8] Typically, the statute of limitations period for breach of contract actions (including those for the sale of goods) accrues at the time of the breach, not when a party sustains damages (*810 Ill. Comp. Stat. 5/2-725(2) (2010)*; *Hermitage Corp. v. Contractors Adjustment Co.,* 166 Ill. 2d 72, 77 (Ill. 1995). However, if a contract requires a demand for performance, accrual begins on the date the demand is rejected (see *Schreiber v. Hackett,* 173 Ill. App. 3d 129, 131 (Ill. App. Ct. 1988)).
[9] "…actions on unwritten contracts, expressed or implied, or on awards of arbitration, or to recover damages for an injury done to property, real or personal, or to recover the possession of personal property or damages for the detention or conversion thereof, and all civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued."

Contracts - Ohio

Pursuant to Ohio's Uniform Comm. Code 2305.6, "Except as provided in sections 126.301 and 1302.98 of the Revised Code, an action upon a specialty or an agreement, contract, or promise in writing shall be brought within eight years after the cause of action accrued."

Pursuant to 2-725, 1302.98 "(A) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued... (B) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered. (C) Where an action commenced within the time limited by division (A) of this section is so terminated as to leave available a remedy by another action for the same breach, such other action may be commenced after the expiration of the time limited and within six months after the termination of the first action unless the termination resulted from voluntary discontinuance or from dismissal for failure or neglect to prosecute."

Plaintiff maintains claims relating to contracts created in the State of Ohio from his residence there from 2010-2013. Only one matter is being asserted herein, against a contract created between Plaintiff and Mr. Daniel Waters of Waters Law LLC in May of 2013.

Tolling

Pursuant to definition found in Black's Law (10th Ed.), tolling is "a law that interrupts the running of a statute of limitations in certain situations..."   Equitable tolling stops the limitations for claims when (a) defendant has misled plaintiff; (b) Plaintiff has been prevented from asserting rights

in some way; (c) Plaintiff mistakenly asserted rights in an improper forum.  See *Clay v. Kuhl* (Ill. 2000) 727 N.E.2d 217 at 223.

*Clay* discussed the discovery rule as the plaintiff "did not realize the existence of her injury until much later.  Under the discovery rule, a party's cause of action accrues when the party knows or should have reasonably should know of an injury was wrongfully caused." Id at 217 citing *Knox College v. Celotex Corp.* (1981) 88 Ill.2d 407; *Nolan v. Johns-Manville Asbestos* (1981) 85 Ill.2d 161, 171, 52 Ill.Dec.'1, 421 N.E.2d 864; *Witherell v. Weimer* (1981) 85 Ill.2d 146, 156, 52 Ill.Dec.6, 421 N.E.2d 869.   See also *Joseph A. Ruth v. The Paul Revere Life Ins. Co.,* No. 08 C 50102, 2010 WL 3527561, at *2 (N.D. Ill. Sept. 2, 2010).

Claims against Hughes; Berger Shatz; Breen & Pugh; Mr. Whitehead; W.S.G.R., P.C.; Mr. Snyder; and the University of Chicago are all subject to equitable tolling as actions stated via facts contained within (further supportable via adequate discovery) qualifies as bad faith actions and defendant(s) misleading Plaintiff in a particular way; perhaps in multiple ways.

Further, under CCP Sec. 351, "If, when the cause of action accrues against a person, he is out of the State, the action may be commenced within the term herein limited, after his return to the State, and if, after the cause of action accrues, he departs from the State, the time of his absence is not part of the time limited for the commencement of the action."

As such, claims filed regarding occurrences in Illinois and Ohio are tolled during the time Plaintiff was out of those respective States.  Plaintiff departed Illinois on several occasions (July, 2006 to July, 2007 and again from June, 2010 to present).   Plaintiff lived in Ohio from July, 2006 to July, 2007 and again from June, 2010 to mid-September, 2013.

It appears to Plaintiff, therefore, that claims asserted under Illinois law regarding situations that occurred in that state have been tolled while Plaintiff has been out of that state (from c. July,

1  2006 to July, 2007 and again from June, 2010 to present), concealment, deceit, and actions in bad

2  faith notwithstanding.    Further, claims arising from situations that occurred in Ohio have been tolled

3  as Plaintiff resided in California since September 25th, 2013, concealment, deceit, and actions by

4  defendants in bad faith notwithstanding.

5      "A cause of action arising in another state, by the laws of which an action cannot be

6  maintained thereon because of lapse of time, can be enforced in California by a citizen of California,

7  if he has held the cause of action from the time it accrued."  *Grant v. McAuliffe* (1953) 41 Cal.2d

8

9  859, 264 P.2d 944.

10                     **Figure #3 – Partial Timeline - Tolling Factors**



11

12

13

14

15

16

17      After departing Univ. of Chicago curriculum in April, 2008 (a school that maintains a law

18

19  school and subsequent library), Plaintiff endured harassment, was evicted from his home and entered

20  bankruptcy.  Although the statute of limitations might have otherwise been running for claims against

21  Breen & Pugh, it is unreasonable to expect Plaintiff to endure harassment, eviction, and bankruptcy

22  while researching breach of fiduciary or other claims committed by Mr. Breen, Mr. Pugh, and/or their

23  firm(s) as such conduct made it impossible for Plaintiff to pursue claims.   See *Clay*, supra.

24

25      The same principle applies to claims against Hughes; Berger Shatz; Mr. Whitehead;

26  W.S.G.R., P.C.; the University of Chicago; and Mr. Edward Snyder.

27

28

1    Plaintiff suggests those claims' accrual date would be tolled until Plaintiff endured a

2    somewhat normal life – free from harassment, ancillary tortious conduct, or lawsuits. Plaintiff's

3    recollection puts that time as per his exit from a homeless shelter in Akron, Ohio c. June, 2011.

4    Even then, Plaintiff held a full time position requiring work late into the evenings and on Saturdays.

5    The only day available for legal research was Tuesday of each week.   Plaintiff also resided in

6    condemnable housing during that timeframe.   Nevertheless, Plaintiff assumes tolling would only

7    suspend the accrual date for Illinois claims until he became somewhat normally housed from June,

8    2011 until Sept., 2013.

9    Therefore, if claims were made against attorneys for either tort or contract under 735 ILCS

10    5/13-214.3, the accrual date would begin June, 2011 and the limitations period would end c. June,

11    2013.   However, due to the fact that Plaintiff left the State and due to the thread of deceitful and bad

12    faith tactics running within each claim (against Hughes, Berger Shatz, Breen & Pugh, Mr. Whitehead,

13    and the University of Chicago), the statute of limitations is actually governed by fraudulent

14    concealment (735 ILCS 5/13-215) or tortious interference, not by 5/13-214.3.

15    The discovery rule is also applicable.

16    Considering Plaintiff first filed a case against Mr. Breen and Mr. Pugh's former firm in

17    December 2010, the initial claim was asserted well within the statute of limitations.   Although these

18    claims were dismissed in April of 2011, Plaintiff pursued appeals of the core matters against Oracle

19    and Ariba.   Those claims were not fully dismissed by the Sixth Circuit's U.S. Court of Appeals (11-

20    3466 and 11-3463) until the end of 2011.[10]   Therefore, it is unreasonable to assume Plaintiff could

21    have reasserted claims until sometime after those matters had concluded (he was working full time

22    and in a homeless shelter in Akron, Ohio).   Tolling would also apply from September 20th, 2013

---

[10] Plaintiff is basing this claim on his online research – that the appeal was filed on May 4th, 2011 and likely concluded about 6 months following that date.   http://dockets.justia.com/docket/circuit-courts/ca6/11-3463

when Plaintiff began his drive to California until the amended complaint asserting claims against Breen & Pugh was filed in Case No. 14-00353-RS (N.D. Cal., ECF Doc #56) or September 30th, 2014.

From Sept. 2013 to Sept. 2014, Plaintiff has been involved in no fewer than 7 active cases [5 as Plaintiff or Petitioner] and 30 government claims act processes in San Francisco, California (where he drove to seek legal help from Stanford University relating to this case and related originating matters). During that time, he has been harassed, threatened, assaulted, battered, unlawfully arrested and jailed. See Ex. 14 for a spreadsheet of Plaintiff's hours from late 2013 to 2014 (+/- 10%); see also 14-00353-RS, ECF Doc #56, Ex. 4-32.

During the aforementioned timeframe, it is only reasonable to expect Plaintiff to re-assert claims against the firm after research could have been conducted (nights, weekends) from c. June 2011 to c. Aug. 2013. Since tolling again applies from September, 2013 to September, 2014 for Ohio and Illinois claims, Plaintiff's claims are not time barred and were asserted well before the limitations period ended.

A summary of applicable tolling principles and dates can be found in Ex. 17.

//

## VI. CLAIMS IN SUPPORT OF A CAUSE OF ACTION

### Claims against Hughes

(1) Plaintiff asserts claims for breach of fiduciary duty and fraudulent concealment;

(2) Plaintiff asserts claims for breach of contract and fraudulent concealment;

(3) Plaintiff asserts a claim for breach of the covenant of good faith and fair dealing;

(4) Plaintiff asserts a claim for legal malpractice;

(5) Pending allowance of such a claim pursuant to Cal. Civ. Code § 1714.10, Plaintiff asserts a claim for conspiracy;

### Claims against Berger Shatz

(6) Plaintiff asserts a claim for breach of contract;

(7) Plaintiff asserts a claim for breach of the covenant of good faith and fair dealing;

(8) Pending allowance of such a claim pursuant to Cal. Civ. Code § 1714.10, Plaintiff asserts a claim for conspiracy;

### Claims against Mr. Thomas Breen, Mr. Todd Pugh, and their Firm

(9) Plaintiff asserts a claim for breach of fiduciary duty and fraudulent concealment for failure to perform discovery;

(10)    Plaintiff asserts a second claim for breach of fiduciary duty and fraudulent concealment for failure to disclose evidence;

(11)    Plaintiff asserts a third claim for breach of fiduciary duty for failure to disclose expunged record;

(12)    Plaintiff asserts claims against Mr. Thomas Breen for breach of contract and breach of the covenant of good faith and fair dealing;

(13)    Plaintiff asserts a claim for breach of fiduciary duty and tortious interference against Mr. Todd Pugh;

(14)    Plaintiff asserts a claim for a violation of the 6th Amend. (U.S. Const.) re: a person's "right to a fair trial";

(15)    Plaintiff asserts a claim for defamation by republication;

(16)    Pending allowance of such a claim pursuant to Cal. Civ. Code § 1714.10, a claim for conspiracy;

### Claims against Mr. Fred W. Alvarez

(17)    A claim for breach of fiduciary duty and a breach of Cal. B&PC §6068 is asserted against Mr. Alvarez;

(18)    Pending allowance of such a claim pursuant to Cal. Civ. Code § 1714.10, a claim for conspiracy;

### Claims against University of Chicago (see Exs. 1-8)

(19)    Plaintiff asserts a claim for defamation by way of republication;

(20)    Plaintiff asserts a claim for breach of contract relating to a right for a student to proceed through disciplinary hearing;

(21)    Plaintiff asserts claims for breach of fiduciary duty;

### Claims against Mr. Edward Snyder (see Exs. 1-8)

(22)    Plaintiff asserts a breach of fiduciary duty;

(23)    Plaintiff asserts claims for breach of contract;

(24)    Plaintiff asserts a claim for a breach of the covenant of good faith and fair dealing;

### Claims against Mr. Michael Boskin (see Ex. 12 for facts in support)

(25)    Plaintiff asserts claims for breach of contract;

(26)    Plaintiff asserts a claim for a breach of the covenant of good faith and fair dealing;

<u>Claims against Mr. Daniel Waters & Waters Law LLC</u>

(27)    Plaintiff asserts a claim for breach of contract;

(28)    Plaintiff asserts a claim for a breach of the covenant of good faith and fair dealing;

<u>Claim against the United States and Pops McGovern, as individual and as agent of</u>

<u>UNITED STATES OF AMERICA</u>

(29)    Plaintiff asserts a claim for conspiracy;

(30)    Plaintiff asserts claims for breach contract and the covenant of good faith and fair

dealing;

<u>Consolidated Claim – all named non-attorney-entities and individuals</u>

(31)    Plaintiff asserts a claim for conspiracy[11].

## VII.    FACTS AND LAW IN SUPPORT OF CAUSE(S) OF ACTION

<u>Fiduciary Case Law – California, Illinois, Ohio</u>

As several claims relating to fiduciary relationships are being asserted, Plaintiff supplies a brief

discussion of fiduciary duty contained in case law.  Considering claims asserted herein occurred in

Illinois, Ohio and California, Plaintiff is supplying a few interpretations – most of which appear

uniform – to the Court.

"The essence of a fiduciary or confidential relationship is that the parties do not deal on equal

terms, because the person in whom trust and confidence is reposed and who accepts that trust and

confidence is in a superior position to exert unique influence over the dependent party." *Barbara A.*

*v. John G.* (1983) 145 Cal.App.3d, 369, 383.  The U.S. Supreme Court has stated that "[t]he relation

between attorney and client is a fiduciary relation of the very highest character, and binds the attorney

---

[11] *Doherty v American Motors Corp*. 728 F2d 334, 339 (6th Cir. 1984).  "Two separate entities are required in a conspiracy claim; a corporation and its own agents or employees are considered to be one entity" quoting *Nelson Radio & Supply Co v Motorola*, 200 F2d 911, 914 (5th Cir 1952), cert denied, 345 US 925 (1953).

to most conscientious fidelity ...." *Cox v. Delmas* (1893) 99 Cal.Rptr. 104, 123 [28 P. 687]; see also *Rader v. Thrasher* (1962) 57 Cal. 2d 244, 250 [18 Cal.Rptr. 736, 368 P.2d 360]; *Sanguinetti v. Rossen* (1906) 12 Cal.App. 623, 630 [107 P. 560]; 1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, §§ 47-54, pp. 55-62.

A fiduciary relationship requires "'more than the ordinary relationship of employer and employee.'" *State ex rel. Charlton v. Corrigan*, 36 Ohio St.3d 68, 71 (1988) (quoting *In re Termination of Employment,* 40 Ohio St.2d at 114). In determining whether a fiduciary relationship exists between an employee and employer, "emphasis should be placed upon whether the assigned job duties require, as essential qualifications over and above technical competency requirements, a high degree of trust, confidence, reliance, integrity and fidelity." *Charlton v. Corrigan*, 36 Ohio St.3d 68, 521 N.E.2d 804 (1988)]. Job duties that require a great degree of discretion support the existence of a fiduciary relationship, whereas assigned duties of a routine character do not involve the degree of discretion or trust necessary to be considered a fiduciary. *Id.* at 71-73, 521 N.E.2d 804.

In California, the court suggested that "[a] member of the State Bar should not under any circumstances attempt to deceive another person..." *Cutler v. State Bar* (1969) 71 Cal. 2d 241, 252 [59 Cal.Rptr. 425, 428 P.2d 289]; *McKinney v. State Bar* (1964) 62 Cal. 2d 194, 196 [41 Cal.Rptr. 665, 397 P.2d 425]; cf. Bus. & Prof. Code, § 6106.

When parties engage in certain relationships such as attorney and client, principal and agent, trustee and beneficiary, or partners, a fiduciary or confidential relationship arises as a matter of law. It is also clear that, even in the absence of such traditional categorizations, the relationship will be found to exist as a matter of fact when one party reposes trust and confidence in another who thereby gains a resulting influence and superiority over the first. *See McFail v. Braden,* 19 Ill.2d 108, 166

N.E.2d 46, 51 – 52 (1960); *Collins v. Nugent,* 110 Ill.App.3d 1026, 443 N.E.2d 277, 66 Ill.Dec. 594

(1st Dist. 1982).

"In determining whether a fiduciary relationship has arisen, factors to be considered are

degree of kinship, if any, disparity in age, health, mental condition, education, and business

experience between the parties, and the extent to which the allegedly subservient party entrusts the

handling of his or her business and financial affairs to the other and reposes faith and confidence in

the other. The mere existence of a confidential relationship prohibits the dominant party from seeking

any selfish benefit."    *Collins, supra; In re Estate of Wernick,* 151 Ill.App.3d 234, 502 N.E.2d 1146,

104 Ill.Dec. 486 (1st Dist. 1986). *See also In re Estate of Long,* 311 Ill.App.3d 959, 726 N.E. 2d 187,

244 Ill.Dec. 591 (4th Dist. 2000); *Ransom v. A.B. Dick Co.,* 289 Ill.App.3d 663, 682 N.E.2d 314, 322,

224 Ill.Dec. 753 (1st Dist. 1997).

A power of attorney gives rise to a general fiduciary relationship between the grantor of the

power and the grantee as a matter of law. *Lemp v. Hauptmann,* 170 Ill.App.3d 753, 525 N.E.2d

203, 121 Ill.Dec. 397 (5th Dist. 1988).

*Richelle L. v. Roman Catholic Archbishop,* 106 Cal.App.4[th] 257 suggests a "fiduciary relationship

is a recognized legal relationship such as guardian and ward, trustee and beneficiary, principal and

agent, or attorney and client [see Frankel, Fiduciary Law (1983) 71 Cal.L.Rev. 795], whereas a

'confidential relationship' may be founded on a moral, social, domestic, or merely personal

relationship as well as on a legal relationship."    *Pierce v. Lyman*, 1 Cal. App. 4th 1093, 1101 (1991)

discusses breach of fiduciary claims in California whereby Plaintiff must allege "the existence of a

fiduciary relationship, its breach, and the damage caused by the breach."

In *Matter of Topco, Inc.* (1990) 894 F.2d 727, 728 [16]), trustees are "held to high fiduciary

standards of conduct."    11 U.S.C.A. § 704(a)(4), authorizes a bankruptcy trustee to "investigate the

1    financial affairs" of the debtor.    Pursuant to 11 U.S.C.A. §323(b), a trustee can sue and be sued.

2        Pursuant to the United States' Department of Justice's ("DOJ") website, United States

3    Bankruptcy Trustees[12] are part of the U.S. Department of Justice.    Plaintiff has included relevant

4    case law regarding the United States' accountability as he has previously asserted claims against that

5    governmental entity in a related and judicially noticed case (14-00353-RS, N.D. Cal.).

6

7                                    Fraudulent Concealment – Illinois

8        Plaintiff has asserted several claims against attorneys in Illinois (Hughes; Breen & Pugh;

9    Berger Shatz).  Each of these claims, Plaintiff contends, are made under that State's fraudulent

10   concealment statute as several facts in support of claims for breach of fiduciary duty or breach of

11   contract also suggest these firms engaged in a pattern of concealment [of facts, of a State's legal

12   processes, of Plaintiff's rights, of evidence] in order to control the outcome of a previous case

13   [Marital Dissolution in re: Hughes and Berger Shatz; a criminal proceeding in re: Breen, Pugh; a

14   bankruptcy in re: Mr. Jeff Whitehead and the United States Department of Justice (see 14-00353-

15   RS)].

16

17       Fraud may be perpetrated by misrepresentation or by concealment. *Chatham Surgicore, Ltd.*

18   *v. Health Care Service Corp.*, 356 Ill. App. 3d 795, 803, 826 N.E. 2d 970, 977 (1st Dist. 2005).

19   "While mere silence in business transactions does not generally amount to fraud, a party's 'duty to

20   speak' is triggered when [the] party's silence is accompanied by deceptive conduct or suppression of

21   material facts results in active deception." *FE Digital Investments Ltd. v. Hale*, 499 F. Supp 2d 1054,

22

23

24   _____

25   [12] http://www.justice.gov/ust/eo/ust_org/.  The primary role of the U.S. Trustee Program is to serve as the "watchdog over the bankruptcy process." As stated in the USTP Mission Statement:  The mission of the United States Trustee Program is to promote the integrity and efficiency of the bankruptcy system for the benefit of all stakeholders – debtors, creditors, and the public.  The Attorney General is charged with the appointment of United States Trustees and Assistant United States Trustees. The Executive Office for U.S. Trustees (EOUST) in Washington, D.C., provides general policy and legal guidance, oversees the Program's substantive operations, and handles administrative functions. The Director of the Executive Office, whose authority derives from the Attorney General, oversees a staff comprised of the Offices of the Director, General Counsel Administration, *Review & Oversight*, and Research & Planning. The Executive Office also provides administrative and management support to individual U.S. Trustee Offices in their implementation of Federal bankruptcy laws.

26

27

28

Case No. _____U.S.D.C. N.D. Cal.
Complaint

1061 (N.D. Ill. 2007).    "In a confidential or fiduciary relationship, the dominant party's silence alone may constitute fraudulent concealment."    *Janowiak v. Tiesi*, 402 Ill. App. 3d 997, 1006, 932 N.E.2d 569, 579 (1st Dist. 2010), quoting *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 25, 799 N.E.2d 756, 765 (1st Dist. 2003), quoting *Melko v. Dionisco*, 219 Ill. App. 3d 1048, 1061, 580 N.E. 2d. 586, 593 (2nd Dist. 1991).

Plaintiff's reading of the case citations is that any thread of fraudulent activity governs a corresponding claim's statute of limitations.    As such, the statute of limitations governing fraudulent concealment and tortious interference governs.

The real issue, however, seems to be congressionally rooted.    Why does a tort or contract claim against an attorney maintain a separate statute for breaches of contract [10 years under normal contract claims, 2 years for attorney services under 738 ILCS 5/13-214.3]?    Did attorneys write the statute?

It seems to Plaintiff this statute may conflict with the 14th Amendment (U.S. Const.) or the respective Illinois Constitutional Amendment regarding equal protection of those rights.    If breaches of contract in the State of Illinois have a 10 year statute of limitations and the 14th Amendment guarantees the equal protection of those laws, no additional statute shortening that timeframe is lawful under that amendment (or the relevant State Const. Amendment) as it gives an undue, unfair advantage to the group benefiting from the statute (attorneys).

As Plaintiff has argued tolling, he is not raising this argument but may if the Court decides to discard the tolling suggestion.    The concern reminds Plaintiff of the statutes giving women and African-Americans the right to vote.    With the 14th Amendment (U.S. Const.) in place, why the need for specific amendments giving these two groups already guaranteed rights?

<u>Hughes & Berger Shatz - Illinois</u>

Plaintiff retained Hughes in re: a marital dissolution in 2006 in Chicago, Illinois. An express contract was put in place between Plaintiff and Hughes on or about July 4th, 2006 and is subject to the statute of limitations for breaches of contract in Illinois[13]. Considering this action is filed in California due only to logistical concerns, CCP § 410.10 applies where "A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."

 a.  Failure to Perform Discovery – Hughes and Berger Shatz

At the time of his divorce, Plaintiff maintained several claims including rights to past due compensation, harassment, defamation, breach of fiduciary duty and other claims that he later asserted to both a bankruptcy attorney and to the U.S. Trustee presiding over his bankruptcy, which concluded in March, 2010 in Chicago, Illinois (see #13-04457-EMC, ECF Doc #1-3, pg. 1-29).

Plaintiff is not an expert on marital dissolution matters, but suggests that both Berger Shatz (counsel for Plaintiff's wife) and Hughes (counsel for Plaintiff) in this matter failed to perform anything remotely close to appropriate or required levels of discovery in order to identify both external and internal factors that contributed to the marriage's demise.

Although Plaintiff finds it embarrassing to file this action and claims about a divorce from 2006 (filed first in 2010 in Ohio, again in 2014 in California), such a filing is nonetheless required in order for proper remedy. Plaintiff did not originally consider that these two firms maintained responsibilities to perform some level of interrogatory with Plaintiff, his wife, or even their therapist in order to uncover core reasons for marital problems. Plaintiff believes he and his former wife maintained rights to relief from Plaintiff's employers and perhaps even a therapist (who never once questioned them about sex while in therapy, therapy that lasted three years). In other words, the

---

[13] Statute of limitations ("SOL") for breaches of a written contract in Illinois is 10 years. If any payment or new promise to pay was made during that 10 year period, an action may be commenced 10 years from the date of the new payment or promise (735 ILCS 5/13-206). SOL for oral contracts is 5 years (735 ILCS 5/13-205).

dissolution process itself most likely maintains a certain right or expectation for each party in the process to list all of the factors contributing to the marriage's end and allow discussion of those factors to occur between the parties' attorneys and/or directly between spouses.

As a personal belief, this is the opportunity to say goodbye, thank your partner, or otherwise try and part ways honorably. It may even demand delay of the end in order to uncover circumstances [perhaps the reason behind Illinois' two year waiting period, see 750 ILCS 5/401(a)(2)]. Once again, the duty to perform discovery resides upon the trained expert.

In this matter, those experts were Hughes and Berger Shatz.

Had they performed discovery, Hughes might have discovered that Plaintiff had developed a stiff drinking habit, was overweight and thus sexually unattractive to his wife, and had built up a tolerance to prescribed anxiety medication due, in part, to harassment endured by employers.

At the same time, the attorneys may have uncovered Plaintiff attempted to discuss sex while in therapy and was sternly prevented from doing so by his wife who happened to be a social worker (she was trained as a therapist herself). It may have been discovered that Plaintiff and his former wife had not had sex for 5 or 6 months before she asked for a divorce. They might have discovered that Plaintiff often found certain parts of his wife extremely stress-relieving; the smell of her neck or the feel of her bare leg against his. At times, she refused to engage in this stress-relieving endeavor; sometimes enjoying the power of refusal. She often asserted how her cats were more important to her than Plaintiff. It would have been discovered that when his wife needed him, he put work aside and performed legal investigatory work on her behalf (regarding a fire c. 2002). When he maintained legal claims, she and her father were noticeably absent.

Plaintiff contends that if discovery was adequately completed by his attorney (Hughes) or if Berger Shatz performed appropriate discovery with Plaintiff's former wife, more accurate root

cause(s) would have been identified and appropriate remedy sought as part of the dissolution process itself.    In other words, part of the dissolution would have been lawsuits filed by these firms on behalf of Plaintiff and his wife, with monetary benefit attached to both (separately).  The lack of discovery is what constitutes this claim for breach.

Plaintiff can't supply the Court with a copy of the written contract between he and his former counsel (Hughes) as he has lost almost every possession he once maintained but recalls – vaguely - that one was put in place.  Plaintiff assumes a contract was put in place between his former wife and Berger Shatz.

The lack of appropriate discovery performed by either firm in this matter supports an additional claim for breach of contract (one claim asserted against each firm) as well as a breach of the covenant of good faith and fair dealing.  The contract and the duty of an attorney would require some adequate level of discovery, discovery did not take place (a breach), and damages have been caused (i.e. – Plaintiff does not have money he has earned or is entitled to from former employers; his wife would have rights to some % of that amount).

According to the DuPage County Bar Association[14], the implied covenant requires that parties to a contract use "good faith and fair dealing in its performance and its enforcement" of the contract.  "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness."

"Illinois recognizes and implies a covenant of good faith and fair dealing in every contract absent a specific provision or disavowal to the contrary.  This principle ensures that parties do not try

---

[14] Online Journal of the DuPage County Bar Association, found at: http://www.dcbabrief.org/vol161203art1.html.

to take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or to do anything that will destroy the other party's right to receive the benefit of the contract."  *Online Journal of the DuPage County Bar Association.*

Plaintiff has also submitted detailed documents to the U.S. Attorney in San Francisco, California (approx. 60 pages) to be taken as affidavits.  Some of the employment facts were documented in Case No. 14-00353-RS (N.D. Cal. 2014) as ECF Doc #56-25.    Discovery should have uncovered these facts.

   b.  Fraud. Concealment of Facts – Right to Monetary Property (Hughes)

Plaintiff recalls one claim – for $30,000 - that he asserted as joint marital property.  Hughes convinced Plaintiff the money was his wife's.   Even as Plaintiff may have, after reflection, waived right to that property from his wife (as it was borrowed from Plaintiff's father-in-law), ½ of that amount was his lawful property at that time.

There was no lawful or ethical reason for Hughes to coerce Plaintiff to give up his rights to that property and because Hughes chose to argue on behalf of Plaintiff's wife and not Plaintiff, the facts support a claim for legal malpractice under Illinois law.

   c.  Fraud. Concealment of Facts – Mandatory 2 Year Waiting Period

Plaintiff also recalls a situation where Hughes informed Plaintiff that there was a mandatory 2 year waiting period [see 750 ILCS 5/401(a)(2)] for divorce in the State of Illinois.  Hughes suggested Plaintiff could waive that period.   In hindsight and considering Plaintiff's employment claims, this 2-year waiting period would have been beneficial as it would have given Plaintiff time to recover from the sting of dissolution's arrival, cease alcohol consumption, regain confidence, engage in work and travel again, and discover claims against former employers. Even if Plaintiff's mindset was, at the

time, to just exit the situation and give his wife whatever she desired, it would have certainly been in Plaintiff's best interest to wait as per the statute and perform in depth discovery.

Plaintiff contends that Hughes utilized the confidence instilled via the attorney-client relationship to gain a position of power and influence over Plaintiff and, at a time when Plaintiff needed guidance to serve his best interests (and perhaps his wife's), this attorney instead decided to use that influence to quickly railroad the dissolution process to conclusion. Such a course of action benefited Plaintiff's wife as opposed to Plaintiff. Although the dissolution process was amicable on its face, the 2 year mandatory waiting period might have flushed out an actual need to argue with his former wife, even have the Court instruct his wife that the situation was most certainly not all Plaintiff's fault.

Because Hughes misused the confidence and position of power bestowed upon the firm regarding the two year waiting period and inaccurately explained the 2 year waiting period (its very purpose), Plaintiff suffered harm [the lack of employment claim identification; ability to claim a higher % of joint property during the dissolution].

d.  Likelihood of "sub-conspiracy" between Hughes & Berger Shatz

The facts listed in subsections a-c suggest that it is possible both Berger Shatz and Hughes engaged in a conspiracy where they planned on favoring Plaintiff's wife in the dissolution process. The suggestion requires discovery and a post-discovery allowance of amended complaint and related supplemental filings to support the claim with detailed facts.

Mr. Thomas Breen & Mr. Todd Pugh - Illinois

a.  Introduction

A written contract between the law firm of Breen, Pugh and Associates (Chicago, IL) and Plaintiff exists. The contract – written by Mr. Breen via letter to Mr. Jesse F. Swartz, Jr. (now

Franklin H. Wright) – simply stated that Mr. Breen and his firm would provide legal counsel in re: a matter between Cook County, on behalf of the Stone Park Police Department, and Plaintiff re: felony criminal allegations the Stone Park Police Department made against Plaintiff c. January 2nd, 2007. The contract between Mr. Breen's firm and Plaintiff was signed by Mr. Breen on or about January 10th, 2007, before Mr. Pugh was made a partner in this firm and while Plaintiff was a resident and citizen of Ohio. Proof of communication with Mr. Breen's firm can be found in *Wright v. U.S.* (2013), Case No. 13-05994-LB (U.S.D.C., N.D. Cal.) and was referenced within the Amended Complaint as an exhibit (Ex. #7).

The matter involved a fight at a nightclub that Plaintiff did not and does not completely recall. While Plaintiff was in jail (he was incarcerated for approx. 48 hrs.), he requested medical assistance and the police attempted to convince Plaintiff he did not need medical attention. On one occasion and during Plaintiff's meetings with Mr. Breen and Mr. Pugh, Plaintiff asked Mr. Pugh whether or not he should sue the police department who had apparently beaten Plaintiff. Plaintiff suffered a black eye that covered 1/3 of his face and had lacerations on his forehead. After being released from jail in Jan. 2007, Plaintiff visited a Lincoln Park, IL hospital for an x-ray after being released from jail and the doctor told Plaintiff he should have had stitches. Plaintiff may have had a concussion despite the doctor stating he had no such concussion.

b. Breach of Contract & Breach of Fiduciary Duty – Lack of Cross or Counter Claims

Before trial began, Plaintiff met with Mr. Breen and Mr. Pugh in their offices on a few occasions. During the initial consultation, Mr. Breen instructed Mr. Pugh to take a picture of Plaintiff's face which Mr. Pugh did. Plaintiff asked Mr. Pugh if they should file a suit against the police and Mr. Pugh asked Plaintiff, "What should we sue them for?" Plaintiff guessed but Mr. Pugh simply responded that there was no case.

In 2007 and during Plaintiff's trial, Plaintiff sat outside a courtroom with Mr. Todd Pugh, one of Plaintiff's attorneys (who worked for Mr. Breen). Mr. Pugh told Plaintiff he had watched the tape of the fight and said "the law was broken." Mr. Pugh did not say who broke the law. Mr. Pugh asked Plaintiff if he wanted to see the tape and Plaintiff, not wanting to re-live an embarrassing moment, declined. Mr. Pugh asked Plaintiff "Can you live with a misdemeanor?" Under coercion, plaintiff agreed to the misdemeanor. Plaintiff contends this situation suggests Mr. Breen and Mr. Pugh used the confidence instilled in them to act on the police department's behalf. Mr. Pugh should have filed counter-claims (after filing tort claims pursuant to Illinois' tort claims processes) against Plaintiff's assailants (perhaps club employees, perhaps police). Because no such claims were filed, both contractual and fiduciary breaches occurred.

c. Breach of Contract & Breach of Fiduciary Duty – Right to Discovery & Disclosure

In hindsight and as can be inferred from this case and those to be judicially noticed, Plaintiff maintained several claims against previous employers (as stated within) and his employer at the time of the incident (Oracle Corporation) and those claims were partially at root for the incident that occurred on or about January 2nd, 2007. It is quite fair to assume that damages suffered by Plaintiff since that time are also recoverable as Mr. Breen and Mr. Pugh's breaches caused delay of financial and reputational recovery which would have kept Plaintiff out of homeless shelters in 2010, 2011 and 2013-2014. Such relief would have kept Plaintiff from enduring an eviction and bankruptcy.

In addition, Plaintiff believes Stone Park police officers lied on the stand and were subject to claims made under Illinois' tort claims act processes and, if denied, a subsequent lawsuit. To Plaintiff's knowledge, no such claims were made and very little investigatory and discovery work was completed by Mr. Breen, Mr. Pugh and/or their respective firm(s), despite Plaintiff's requests for representation to perform these tasks.

Case No. _____U.S.D.C. N.D. Cal.
Complaint

Pursuant to Article VIII of Illinois' Rules of Professional Conduct and reasonable interpretation of fiduciary obligations, Plaintiff makes two claims herein – one for breach of fiduciary duty one for breach of written contract. Due to the deceitful nature of the conduct, Plaintiff suggests these claims would be governed by one, or both, of Illinois's statutes governing fraudulent concealment and tortious interference. Fraudulent concealment's statute of limitations is governed by 735 Ill. Comp. Stat. 5/13-215; tortious interference is governed by 735 Ill. Comp. Stat. 5/13-205 (2010); see *Federal Signal Corp. v. Thorn Automated Sys., Inc.*, 295 Ill. App. 3d 762, 765–66 (Ill. App. Ct. 1998); 693 N.E.2d 418 at 420.

      d.  Tortious Interference (2 counts), Breach of Fiduciary Duty (2 counts), Breach of Contract (2 counts) & 6th Amend. (U.S. Const.) Violation

During the trial, Plaintiff spoke with a work colleague who witnessed the fight that occurred in the nightclub on or about Jan. 2nd, 2007. This witness told Plaintiff that Plaintiff had danced on stage at one point and that dancers were actually tipping Plaintiff. He also told Plaintiff that Plaintiff was "acting like the man", perhaps arrogantly claiming the world as his oyster (Plaintiff weighed approx. 265 lbs. at the time and was out of shape).

As a result, someone at the club apparently called the police. The witness told Plaintiff that approx. 5 police personnel jumped on Plaintiff and this witness (a non-U.S. citizen and fellow Oracle Corp. employee from India on a work visa, approx. 5'6" and perhaps 150 lbs.) jumped into the fight with the police and tried to pull the police off of Plaintiff. Apparently, the police ripped this witness' sweater. When Plaintiff recalled the events to Mr. Pugh, Mr. Pugh contacted the witness. Mr. Pugh simply replied "he wasn't a good witness" and left the witness off the stand.

During trial, Plaintiff watched and listened as the officer under interrogatory lied about Plaintiff head butting the officer "with the back of his head." Plaintiff did not have injuries to the

back of his head but did have a laceration on his forehead.  Plaintiff did not witness Mr. Pugh, during his cross-examination, ask the Officer – with specificity – to indicate why, how, and who restrained or otherwise used force in arresting Plaintiff.  Plaintiff contends that any reasonable interpretation of Mr. Pugh's duty as an attorney would require him to disclose, or encourage the officers to disclose – for the record – who had administered the punches or other forceful conduct.

Plaintiff therefore states claims for tortious interference (2 counts), breach of fiduciary duty (2 counts), and breach of contract (2 counts) as Mr. Pugh's actions and inaction did breach both the express obligations and the implied-in-fact obligations of the contract.   Based on previously cited case law interpreting an attorney's duty as fiduciary, Mr. Pugh also breached his obligation as an attorney in both instances (re: the refusal to admit witness testimony and Mr. Pugh's failure at the trial).

Finally, Mr. Pugh's conduct during pre-trial and trial activities supports a claim for a sixth amendment violation as Plaintiff was denied his right to a fair trial.

After this case concluded, Mr. Pugh was made a partner in Mr. Breen's firm.

e.   Fraudulent Concealment – A Videotape

In 2007, Mr. Pugh told Plaintiff there was a tape of the incident that occurred on or about Jan. 2nd, 2007.  In subsequent Plaintiff inquiries [2008, 2009, 2010, and 2013-2014], Mr. Breen and Mr. Pugh were evasive and on several occasions Mr. Pugh indicated there was no tape.  Further, they have denied Plaintiff access to their firm and evidence, all of which conceals claims Plaintiff believes he did and does maintain.  Plaintiff has made no fewer than 5 attempts to see evidence in re: this matter in 2013 and 2014 alone and Mr. Breen and Mr. Pugh have been evasive.  On one occasion, Mr. Breen responded by saying he could not make sense out of Plaintiff's communications and firmly responded not "to make threats."

1    The e-mail is attached hereto as Ex. 13.

2    //

3
4    The second breach of fiduciary claim is made herein and subject to a 5-year statute of

5    limitations as it pertains to fraudulent concealment. See *Chatham Surgicore, Ltd. v. Health Care*

6    *Service Corp.,* supra.

7    In May 2008, Plaintiff began self-discovery and through his notes and personal files

8    discovered claims against a former firm (BroadVision). He contacted Mr. Pugh and sent him a

9    calculated amount of past due compensation for about $275,000 (see Case No. 13-05994-LB (N.D.

10   Cal. 2013); ECF Doc 1-3, pg. 27; see also Doc #1-2 pg. 12-14 for e-mail with BroadVision's General

11   Counsel). Mr. Pugh responded and indicated Plaintiff did not have a case and was evasive. On

12   several occasions from 2008-2011, Plaintiff attempted to contact Mr. Pugh to see the tape and Mr.

13
14   Pugh denied that one existed.

15   f. Breach of Fiduciary Duty and Fraudulent Concealment – Expunged Record

16   The final breach of fiduciary claim involves a recent arrest and subsequent dismissed charges

17   in San Francisco, California [see Case No. 2480252; San Francisco Superior Court, Cal.). Plaintiff

18   has had to explain a misdemeanor on his record and it appears the misdemeanor has been expunged

19   or otherwise removed. Plaintiff only learned of the expungement by way of appointed counsel and a

20   F.B.I. arrest record statement. If Mr. Breen or Mr. Pugh expunged or otherwise cleared Plaintiff's

21   record, their responsibilities under fiduciary principles suggest they should have let Plaintiff know

22   allowing Plaintiff to no longer republish this information (see *McKinney*, infra).

23   Plaintiff has contacted Mr. Breen on several occasions via e-mail in Dec. 2014 in advance of

24   this suit and Mr. Breen has not responded to debate these allegations.

25   g. Conclusion and Personal Harm

26
27
28

1     Plaintiff endured reputational harm as a result of excessive and erroneous charges (friends,

2  family, professional) perpetrated by the Stone Park Police Dept. as well as misconduct by Mr. Breen

3  and Mr. Pugh. The Judge's conduct itself may have been unwarranted and subject to additional tort

4  claims against State of Illinois entities (under that State's tort claims act for breach of fiduciary duty).

5

6     Under previously cited statutes for fraudulent concealment and tortious interference,

7  Plaintiff's claim(s) maintains a 5 year statute of limitations.

8     Plaintiff became aware of these two statutes in December, 2014.

9     Plaintiff carried with him claims against several employers and other attorneys. Mr. Breen

10  and Mr. Pugh could have uncovered as part of their discovery. Had discovery been conducted by Mr.

11  Breen, Mr. Pugh or any of their firm's personnel, they may have pursued them as those claims were

12  psychological inputs [i.e. – caused anger, frustration, contributed to need for medication, contributed

13  (partially) to alcohol consumption] that finally resulted in an eruption that occurred on or about Jan.

14  2nd, 2007. Filing claims [administrative claims with the State of Illinois; claims against employers;

15  claims against a former dissolution attorney; claims against a therapist; and counter-claims against

16  Stone Park's Police Department or another entity/individual] on Plaintiff's behalf would have been

17  the responsibility of Mr. Breen, Mr. Pugh and their firm.

18

19     These attorneys' breaches caused Plaintiff to defer enjoyment of a presumed relief amount

20  (which was not debated in U.S.D.C., N.D. Ohio) and also caused Plaintiff to endure tortious conduct

21  (2013-2014, see 14-00353-RS, Doc #56-6 to #56-35) suffered in California, their breaches are subject

22  to both damages from tortious claims (monetary relief) and performance of the established contract or

23  substitution services for breaching both the implied and expressly stated contract's terms.

24

25

26

27

28

It is also important to note there may be two additional facts (reasons) that support a request for tolling claims against Mr. Breen, Mr. Pugh and their current and former firms: on or about Sept. 29th, 2013, Plaintiff recalled the first of two additional details that suggest that:

    a.  Stone Park Police Dept. responded inappropriately and likely breached contractual obligations and terms of their employment contracts (he recently recalled an argument with one of the Officers in the cell re: Auburn and Ohio State);

    b.  Plaintiff may have not started the fight at the club (he recalled the witness may have been harassed by other patrons).   See *Clay*, supra re: "repressed memories."

Recollection in September, 2013 was the first occurrence of remembrance of that January, 2007 evening, save for a vague recollection of a man in a white sport coat.  As such, the accrual date may actually begin on the day following his release from San Francisco General Hospital [c. Oct. 3rd, 2013].   Whether the court agrees with the tolling suggestion or not may be irrelevant, considering fraudulent concealment and tortious interference claims and Plaintiff's initial discovery of his attorneys' duty via the Dec. 2010 Summit County, Ohio filing.

Finally, Plaintiff suggests he has had to explain these situations to employers (an Ohio car dealership from 2012-2013; a consulting firm and software company in 2011; in California lawsuits; in graduate school applications in Ohio and California c. 2009; and while applying to potential employers).  Those admissions are subject to defamation claims under republication principles in their respective states [see *McKinney v. County of Santa Clara* (1980) 110 Cal.App.3d 792, 796-799].

In other words, the cycle of Plaintiff having to explain what has occurred in his career and in his former marriage to both employers and potential dates can't be broken until such time as remedy has been sought and obtained in Court.

The same issue occurs related to dating and future marriage, if such an occurrence comes to pass. Plaintiff was blamed by his wife, was feeling guilty for the marriage's ending and his economic troubles (partially caused by external factors) and will have to explain (and has explained) the situation to former dates. Considering marriage is a legal endeavor, a future wife may have reason to question such a commitment based purely on untruths and rumors; another future divorce might actually acquire this information to be used against him (such information would be inaccurate). Plaintiff can't defeat the defamatory innuendo (see Cal. Civ. Code §45a) because discovery and factual disclosure of these legal incidences have been prevented.

Mr. Breen, Mr. Pugh, and their former and current law firms were and are obligated to perform their duty to remedy under any reasonable interpretation of Article VIII, Illinois Rules of Prof. Conduct guiding attorney behavior; interpretation of an attorney's fiduciary duty; and contractual obligations stemming from Plaintiff and Mr. Breen's contract as well as the covenant of good faith and fair dealing under applicable Illinois law.

<u>Mr. Fred Alvarez - California</u>

Beginning in 2008, Plaintiff sought legal help from various firms including Wilson, Sonsini, Goodrich, & Rosati, P.C. (via faxed Memorandum to Mr. Fred W. Alvarez, former Asst. Secretary of the U.S. Dept. of Labor, 1987-89); Dean(s) and Professors at the University of Chicago (where Plaintiff was once a MBA student in 2008), and various family members relating to past claims he believed he maintained against former employers.

Plaintiff also attempted direct resolution with his former employers to mitigate damages.

All attempts for resolution were rejected.

Of particular note was a 2008 fax sent to Mr. Alvarez (formerly of the U.S. Dept. of Labor; then of W.S.G.R.; now of Jones Day) with claims Plaintiff maintained against BroadVision. The fax

contained supporting proof and a calculated potential claim amount and was filed as an exhibit to a related 2013 case in U.S.D.C., N.D. Cal. (see *Wright v. Stanford*, 13-04557-EMC).   As both an attorney in the State of California and as a former Dept. of Labor executive, Plaintiff suggests Mr. Alvarez breached his fiduciary duty to at least perform basic levels of discovery with Plaintiff.  It is possible Mr. Alvarez maintained an obligation to forward the letter to the U.S. Dept. of Labor considering Mr. Alvarez's probable contractual post-service expectations.

Further, Mr. Alvarez breached Cal. B&PC § 6068(h) which says "Never to reject, for any consideration personal to himself or herself, the cause of the defenseless or the oppressed."  Although neither Plaintiff nor Mr. Alvarez may have been aware, Plaintiff probably qualified as "oppressed" or "defenseless" in re: the Stone Park Police Dept. incident on or about Jan 2nd, 2007 and, considering the fax to Mr. Alvarez was sent after the Jan. 2nd, 2007 Stone Park incident, Mr. Alvarez unknowingly breached the code.

Other portions of that code may also be applicable.

As of the filing herein, Plaintiff has visited (2013-2014) the Justice and Diversity Center's Help Desk in the Phillip C. Burton Building on 2 occasions; visited GAAP on two occasions; Bay Area Legal Aid once; the U.S. Attorney's Office in the Phillip C. Burton Building between 3 and 5 occasions; the Family Law Center in Superior Court between 2-3 occasions; the Homeless Advocacy Project (Mr. Dan Evans) once; ECS Management team on at least 3 occasions; requests for help from lawyers as part of the Homeless Connect event on 2 occasions; one personal visit to the Van Ness office of Homeless Connect; a Motion for Counsel to be Appointed in Wright v. Stanford (Case No. 13-17439, 9th Cir. 2013); personal visits and e-mails to Morrison & Forrester; Nossaman Law Firm; Dolan Law Firm; Wilson, Sonsini, Goodrich & Rosati, P.C.; two in-person meetings with University of California's Hastings's Law School; and left a message with the Bar Association of San Francisco

(at the behest of Morrison & Forrester).  Plaintiff filed motions in 9th Cir. Case No. 14-16282 and 9th Cir. Case No. 14-16563 requesting counsel assignment.  Plaintiff also made several motions within CGC-13-536085 (Superior Court, San Francisco) and 14-00353-RS (U.S.D.C., N.D. Cal.) seeking counsel appointment.  Plaintiff visited Morrison & Forrester and one other attorney in August, 2014 as part of the Homeless Connect event in San Francisco.

Claimant's requests for co-counsel have been denied or ignored.

In order to transition into a discussion of profit seeking firms and obtaining clients, let's consider one case and claim Plaintiff maintained re: his departure from Oracle Corporation (April, 2008).  Plaintiff went through a period of time where he felt extraordinarily guilty; he admitted things he never did to his former father-in-law.  He was encouraged to do so.  Such a psychological state can be read into Plaintiff's filings (see *Swartz v. Oracle Corporation*, supra) where Plaintiff submits motions reducing relief requests (performed in desperation).

However, in one notable instance, Plaintiff suggested he achieved excellent business performance.  Such a claim was not denied or otherwise argued by counsel for Oracle Corporation and was reiterated in the Court's Order to Dismiss (see ECF Doc #21; 5:11-cv-00168-SL, U.S.D.C., N.D. Ohio filed on April 12th, 2011, pg. 10 where "'based purely on business measures, his performance was exceptional'").

Now consider the Federal Rules of Civil Procedure which govern the suit.  Rule 8(b)(1)(B) suggests a party must admit or deny allegations and Rule 8(b)(6) suggests that if a party does not deny allegations, such non-denial has the effect of admission.  As such, Oracle Corporation, by and through its counsel, admitted Plaintiff was an exceptional performer.

Let's return then to the topic of discovery, both within the Courts and as part of the attorney-client engagement process (which consulting firms also perform during business development cycles or in early project stages).

Why did Plaintiff's line of business manager at the time of his 2008 review mark him as "average" and why still did Plaintiff note, within the review, that he concurred? How were promotions and compensation calculated at Oracle Corporation? Was this review part of that promotion and compensation process? Were people within the company lying about Plaintiff and did those lies cause Plaintiff harm? Are these anecdotes still circulated at the company? Why did a line of business manager or Human Resources not confront Plaintiff and encourage him to cease alcohol consumption?

Plaintiff includes this brief discussion because Mr. Alvarez, Mr. Breen, and Mr. Pugh were all contacted about Plaintiff's claims and had they performed adequate discovery – in depth discovery – these claims might have been discovered. In other words, Plaintiff had no idea he had been defamed in this performance review, but an attorney trained to look for such occurrences would know.

<u>University of Chicago - Illinois</u>

In 2005, Plaintiff enrolled in a GMAT preparatory class. Plaintiff then studied and took the GMAT and applied to one graduate program, the University of Chicago's Part Time MBA program, currently known as the Booth School of Business. Plaintiff left under odd circumstances in April, 2008. To attempt to re-engage the school and seek remedy outside of the Courts, Plaintiff sent the school several letters (see Ex. 1, Ex. 2, Ex. 3) to the former Dean of the Graduate School of Business (now Booth School of Business). The letters were all sent to the school within 6 months of his leave of absence and at least two indicated displeasure with the school's product/service.

1    Plaintiff also engaged in e-mail contact with the Dean, with former professors of the business
2    school, and with law professors. E-mail contact lasted from 2008 to 2011 and was somewhat sporadic
3    and involved various professors and Deans from the University's law and business schools. Plaintiff
4    requested legal help on several occasions.
5
6    Around the time of his bankruptcy in 2009, Plaintiff requested readmission. Plaintiff
7    requested readmission again c. 2010 and was denied. In one instance, the School's Associate Dean,
8    Mr. Mark E. Zmijewski, sent Plaintiff a letter insinuating that Plaintiff had engaged in deceiving the
9    school (which Plaintiff denied and denies) and would have been subject to the school's disciplinary
10   process had he not departed c. April, 2008. The letter selectively quoted a letter Plaintiff wrote to the
11   school making it appear self-incriminatory. The school was evasive and deceptive.
12
13   To remedy, Plaintiff filed a case in 2010 while proceeding through bankruptcy [see *Jesse F.*
14   *Swartz v. University of Chicago* (2010), Case No. 2010-L0-04638; Cook County, Illinois] claiming
15   causes of action for breach of contract, breach of fiduciary duty and defamation. The Court
16   dismissed with prejudice Plaintiff's claims. However, his dismissed claim for breach of contract was
17   not based on the fact that the school's disciplinary process had been prevented him; nor were his
18   defamation claims for republication occurrences (occurring c. 2010-2014).
19
20   During that 2010 Illinois matter, Plaintiff was evicted from his condominium and moved to
21   Ohio to live with his parents. While in Ohio, Plaintiff claimed he was harassed by his parents as part
22   of other Ohio case filings.
23
24   The first claim asserted against the University in this matter (for breach of contract[15], see 735
25   ILCS 5/13-206) asserted herein is based on a newly realized fact. It is based his right, as per the
26
27   _____
28   [15] "The elements of a breach of contract claim are (1) the existence of a valid and enforceable contract; (2) performance
     by the plaintiff; (3) breach of contract by defendant; and (4) resultant injury to plaintiff." *Henderson-Smith & Assocs. V.*
     *Nahamani Fam. Serv. Ctr.* (1st. Dist. 2001) 323 Ill.App.3d 15, 27.  A valid contract in the State of Illinois includes "offer

University of Chicago letter and as per school policy, to engage in a disciplinary hearing. Plaintiff suggests the school's policy governs a student's ability to operate within the school's rules with the idea that students will conduct themselves honorably and, in concert, the school [comprised of various faculties, administrative and support staff] would also act honorably. If a disagreement or allegation occurs, as it did at that time, a process to remedy outside the Courts exists. The school's disciplinary policy is a contract; the suggested process of a disciplinary hearing was a process that was (and is) a contractual right retained by Plaintiff, but that right was prevented and denied him.

The denial of this process constitutes the breach of this contract (the policy, in written form, between the school and Plaintiff, as student), the school received consideration (tuition, time, effort), Plaintiff contends he has done work in support of a degree and did not in any way, shape or form breach the honor code, and the harm Plaintiff endured includes reputational harm, the lack of a degree, career harm through lower wages and position, a damaged reputation (among friends, colleagues), the loss of that advanced university experience, and inaccurate defamatory conditions (innuendo that Plaintiff did something wrong at the school). See Ex. 4-7.

A college or university and its students have a contractual relationship, and the terms of the contract are generally set forth in the school's catalogs and bulletins. *Raethz v. Aurora Univ.* (2d Dist. 2004) 346 Ill.App.3d 728, 732 (quotations omitted). "In the student university context, a student may have a remedy from breach of contract when it is alleged that an adverse academic decision has been made concerning the student but only if that decision was made arbitrarily, capriciously, or in bad faith." The facts support a reasonable assertion that the University's acts were capricious in nature and were most certainly performed in bad faith. Limitations are subject to 735 Ill. Comp. Stat 5/13-206 (10 years after accrual date).

---

and acceptance, consideration, and valid and certain terms..." See *Van Der Molen v. Wash. Mut. Fin., Inc.* (1st Dist. 2005) 359 Ill.App.3d 813, 823.

The odd part of this is that the school itself seems to promote itself with rather broad swaths of having "an unmatched faculty." See Ex. 8.  Is that "unmatched" statement 100% accurate?  Plaintiff is not faculty and he's pretty good.  How's Harvard, M.I.T., Penn?  I hear they are mighty smart.  Mr. Boskin is an Economics professor at Stanford and resides on the Board of Directors of Oracle Corporation.

Is every professor at University of Chicago better than Mr. Boskin?

A State of California case discusses libel claims (Cal. Civ. Code § 45 and § 45a) where each disclosure of defamatory material was subject to causes of action under republication principles in their respective states [see *McKinney v. County of Santa Clara* (1980) 110 Cal.App.3d 792, 796-799]. The case suggested, via citations to other states' decisions, that if one could reasonably assume the need to republish defamatory comments (i.e. – to future employers, to future schools, as exhibits to lawsuits), each republication is subject to a claim for damages under California tort laws.

As one example, Plaintiff had to "retell" his stories regarding Jan. 2nd, 2007 and his departure from Univ. of Chicago to Stanford University and Ohio State University in submitting applications to both Stanford's and Ohio State's Business Schools and Stanford's Law School c. 2009.

Plaintiff also submitted the Stanford application as an exhibit to a case filed in California in 2013 (*Wright v. Marriott, et al.,* CGC-13-536085).  Plaintiff included notes and memos to the University of Chicago as exhibits within other California cases (2013-2014) and those exhibits are read by counsel, clerks, and judges.   Plaintiff has discussed these situations with various people while pursuing employment in California (2013-2014) and the facts are contained on his resume (that he departed the school without receiving a degree).

In other words, without a reasonable discovery process and/or disclosure of truthful facts by the University, Plaintiff is unsure how to even explain the departure. Each disclosure of the entrance

and exit from the University suggests to a potential employer that Plaintiff did something wrong (again, such an allegation is untrue).

Under California law, "libel includes almost any language which, upon its face, has natural tendency to injure a person's reputation[16]." *Moore v. Greene* C.A.9 (Cal. 1970), 431 F.2d 584. Because Plaintiff resubmitted the Stanford Application in 2013 as exhibited evidence of work contributions and in support of character assertions (that he is of high moral character) in Case No. CGC-13-536085, Plaintiff suggests the submission of the application and it's references to the University of Chicago departure are subject to a cause of action for libel under California law (see Civ. Code § 45 and § 45a)[17].

<u>Mr. Edward A. Snyder - Illinois</u>

Plaintiff sought assistance from this former Dean (then at the University of Chicago) regarding his bankruptcy and claims held by Plaintiff against former employers (Ex. 1-3). Plaintiff contends Mr. Snyder maintained an obligation (fiduciary duty; contractual) to assist Plaintiff in pursuit of legal remedy and gather facts in support of Plaintiff's pursuit of claims against former employers. Instead of assistance, Mr. Snyder replied suggesting Plaintiff did not want to do the work and just wanted the esteem offered by the institution. The statement was both false and defamatory.

Plaintiff contends that if Dean Snyder believed Plaintiff had claims against former employers or attorneys (as asserted herein), it stands to reason Plaintiff might have difficulty in school and need to first remedy those occurrences before delving into new curriculum (one option might have been to redirect Plaintiff to study within the University's Law School, a reasonable suggested remedy). Once

---

[16] See also *Smith v. Maldonado* (App. 1 Dist. 1999) 85 Cal.Rptr.2d 397, 72 Cal.App.4th 637 (Tort of defamation involves the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage.)
[17] This is but one example of several instances of republication.

remedy in the Courts was achieved, Plaintiff might be able to proceed with business school study. Plaintiff simply suggests that the heightened level of responsibility, accountability, and esteem incumbent upon the leader of a renowned business school qualifies Mr. Snyder as a fiduciary.  See *McFail v. Braden* (1960), supra.  Considering Plaintiff left an income producing position with hopes of advanced income potential and full-time participation with the school, Plaintiff elevated his reliance upon the school and its Dean(s).

Plaintiff was dependent on the school – for financial support through loans (that were denied him), through reasonable interpretations of rules (denied him), and through disclosure of accurate occurrences (also denied him).

Plaintiff suggests to the Court that Dean Snyder maintained an employment contract with the University and by ignoring Plaintiff's complaints and refusing to meet with Plaintiff, Mr. Snyder did breach both his contractual and fiduciary obligations to Plaintiff.   Again, to accurately record the terms of the Dean's contract, discovery or disclosure would be required.   School policies, Plaintiff's acceptance letter, and the school's employment contracts are all written instruments and subject to 10 year limitations.

In support of separate claims for breaches of fiduciary duty and contract, a "…court, applying Illinois law, has recognized that…two causes of action can coexist, and that damages may be awarded based upon the breach of fiduciary duty even when that duty arose pursuant to a contract." *In re: Edgewater Medical Center* (2006), 344 B.R. 864, s*ee Masi v. Ford City Bank and Trust Co.,779 F.2d 397* (7 Cir. 1985).

Also, a district court case [from Illinois], again applying Illinois law, has expressly held that damages for breach of fiduciary duty may be awarded when a breach of contract claim and a breach

of fiduciary duty claim are based on the same operative facts. *Seerveld v. Gerstenberg & Co.*, 1986 U.S. Dist. LEXIS 29097, 1986 WL2609 (N.D. Ill.) (quotations omitted).

<u>Mr. Jeffrey A. Whitehead & W.S.G.R., P.C. – Illinois & California</u>

In July, 2009, Plaintiff hired Jeff A. Whitehead ("JAW") to represent Plaintiff in re: his Illinois Ch. 7 bankruptcy filing. An agreement letter was put in place and submitted to this Court as an exhibit to an amended complaint [*Wright v. U.S.* (2013); Case No. 13-05994-LB, Ex. 5]. Due to damaged computer equipment that occurred in mid-2014, Plaintiff can't reattach this exhibit.

The requirements of a valid contract are offer and acceptance, consideration, competent parties, legal purpose, and, if agreed to by the parties, a written agreement. *Lal v. Naffah* (1st Dist 1986), 149 Ill.App.3d 245, 500 N.E.2d 699, 792; 102 Ill.Dec. 806. A contract may be express or implied. Express contracts are those in which the terms of the contract are disclosed in the words or writings of the parties. *Bull v. Mitchell* (3d Dist.1983) 114 Ill.App.3d 177, 448 N.E.2d 1016, 1023; 70 Ill.Dec. 138; *Lampe v. Swan Corp.*, 212 Ill.App.3d 414, 415; 571 N.E.2d 245, 246; 156 Ill.Dec. 658, 659 (5th Dist.1991). Implied contracts are those where the agreement is inferred from the acts or conduct or course of dealings of the parties. *In Re Estate of Brumshagen*, 27 Ill.App.2d 14, 169 N.E.2d 112, 116 (2d Dist.1960); *Dallis v. Don Cunningham and Associates*, 11 F.3d 713, 716 (7th Cir.1993). Pursuant to 735 ILCS 5/13-206, claims for breaches of written contracts have a statute of limitations of 10 years; limits for claims based on unwritten contracts are 5 years. See 735 ILCS 5/13-205.

On or about September 15, 2009, Plaintiff sent, via FedEx, a memo and proof for claims against a previous employer to the Bankruptcy Trustee and his attorney as part of Chapter 7 proceeding [Case No. 09-27024, U.S. Bankruptcy Court of Northern Illinois; see also 3:13-CV-05994-LB, Exhibit 26, 27].

1    Since anecdotal details were provided to the trustee and to Plaintiff's bankruptcy attorney,

2    Plaintiff suggests it was the responsibility of his attorney (Mr. Whitehead) to map the anecdotal

3    situation to appropriate statutes and case law to support Plaintiff's claims and follow through with a

4    lawsuit against his employers and former University on his behalf (as well as his creditor's behalf).

5        Instead, during a face-to-face meeting, Jeffrey A. Whitehead told Plaintiff to lie to the trustee.

6    The Bankruptcy trustee put Plaintiff under oath.  During the meeting, Plaintiff ignored his attorney's

7    advice, gave an honest answer, and supplied the trustee with a brief account of the applicable legal

8    concepts he believed were relevant in re: his claims against former employers and the University of

9    Chicago.   In reply, the trustee stated "you need to convince me" in an arrogant and condescending

10   tone and disregarded Plaintiff's Memos.

11       To Plaintiff's knowledge, no due diligence was completed regarding his claims against former

12   employers and the University of Chicago by the U.S. Department of Justice's Bankruptcy Trustee.

13   Memos sent to the trustee have been encapsulated in the Amended Complaint, Exhibits 11-20 (see

14   *Wright v. U.S.* (2013), 3:13-CV-05994-LB, U.S.D.C. N.D. Cal.).

15       All facts supplied to the trustee would have caused a reasonable person to conclude that root

16   cause of Plaintiff's bankruptcy filing were wrongs done to Plaintiff by several employers and the

17   University of Chicago.

18       Therefore, a reasonable person would conclude a lawsuit or government claim (perhaps made

19   to the U.S. Dept. of Labor) on behalf of Plaintiff against these entities would have been initiated

20   pursuant to 11 U.S.C. §704(a)(4).  The aforementioned statute dictates the need for investigation

21   (note the word "shall" in the statute) and 11 U.S.C. §323(b) authorizes the trustee to sue.

22       Plaintiff's claims were ignored and Plaintiff has endured financial disarray and tortuous

23   damages ever since – precisely because the U.S. Bankruptcy Trustee and his attorney did not do their

jobs (a breach of their fiduciary responsibilities to both Plaintiff and his creditors).   A breach of fiduciary duty relating to this bankruptcy was asserted against Defendant U.S. Department of Justice in Case No. 14-00353-RS, U.S.D.C., N.D. Cal.

On several occasions during Plaintiff's meetings with his attorney, Mr. Whitehead took the opportunity to dissuade Plaintiff from pursuing his claims that may have offered Plaintiff financial restitution.   Based on the facts supplied to Mr. Whitehead (Memos filed as part of the bankruptcy filing), Mr. Whitehead had a fiduciary obligation to either insist the trustee sue on his behalf or directly sued on Plaintiff's behalf.   Because he did not, a breach occurred.   The breach was of both contractual nature and of fiduciary duty.

One of Mr. Whitehead's e-mails to Plaintiff indicated malicious intent.

When Plaintiff suggested utilizing the bankruptcy as an opportunity to re-route the bankruptcy and seek justice re: his Memos, Mr. Whitehead responded: "I think that makes sense in your strategy, but not in mine" and then suggested Plaintiff proceed *pro se*.   Mr. Whitehead used the power given him via the attorney-client fiduciary relationship (via the trust reposed in the duty of attorney) to lure Plaintiff into a false sense of security, suggest alternatives and courses of action that would harm Plaintiff (i.e. – lie to the trustee, ignore claims) and then remove himself once the damage was done. After Mr. Whitehead suggested Plaintiff proceed *pro se*, Plaintiff fired him (on or about Jan. 15th, 2010).

The anecdotes herein support claims for breaches of fiduciary duty and claims for breaches of contract and the covenant of good faith and fair dealing under both Illinois law and U.S. Supreme Court interpretations of these common legal elements, as cited within.

Statute of limitations would be governed under previously cited fraudulent concealment or via Illinois's statute for tortious interference of a contract (both 5 years).   See 735 Ill. Comp. Stat.

1   5/13-205 and 5/13-215; *Federal Signal Corp. v. Thorn Automated Sys., Inc.*, 295 Ill. App. 3d 762,

2   765–66 (Ill. App. Ct. 1998).

3                    <u>Wilson, Sonsini, Goodrich & Rosati, P.C. - California</u>

4
5         Jeffrey A. Whitehead has the following initials: "JAW".  Plaintiff's great-uncle, John A.

6   Wilson, is a primary founder of the Bay Area-headquartered law firm Wilson, Sonsini, Goodrich, &

7   Rosati, P.C. and has the initials "JAW".   Plaintiff and Mr. Wilson attended the same college

8   preparatory school, Western Reserve Academy, albeit in different years.  Plaintiff was told by his

9   father that Mr. Wilson paid for a majority of his secondary school education.

10
11        Plaintiff contends that Jeffrey A. Whitehead was both acting on his own regarding Plaintiff's

12  bankruptcy and was, at the same time, acting under the guidance and influence of both the U.S.

13  Department of Justice ("DOJ") and W.S.G.R. as some sort of unbeknownst-to-Plaintiff governmental

14  and legal training.   Assuming Plaintiff's assertion was correct, one of the training's lessons was in re:

15  self-reliance; reassurance that one can locate a library, perform research, and make a case.   Another

16  lesson (reiterated in multiple situational anecdotes) embeds the meaning of *fiduciary*.

17
18        The bankruptcy was merely one occurrence of the repeated lesson.

19        Plaintiff therefore maintains and asserts claims for breach of contract, covenant of good faith

20  and fair dealing, and fiduciary duty against W.S.G.R. under previously cited case and statute and

21  holds claims for conspiracy against Jeffrey Whitehead, the U.S. DOJ and W.S.G.R. regarding

22  Plaintiff's Illinois bankruptcy.  In other words, the contract written by Mr. Whitehead was not only

23  one written by him, but one written on behalf of W.S.G.R. and the U.S. DOJ.

24
25        Claims for the extension of legal misdeeds to cooperating third parties are referenced within

26  *Pierce v. Lyman*.[18]

27

28  ---

[18] 1 Cal. App. 4th 1093, 1104. "In California, few cases have addressed the issue whether and under what circumstances a third party may be liable for colluding or conspiring with a fiduciary to breach the fiduciary's duty. In *Gray v.*

<u>Pops McGovern (alias) – Ohio</u>

Following Plaintiff's bankruptcy and eviction in Illinois, Plaintiff resided with his parents. Plaintiff and Plaintiff's father enacted a verbal contract whereby, in Plaintiff's father's words Plaintiff could "Stay as long as 'Plaintiff' wanted." Plaintiff was in Illinois, Plaintiff's father was presumably in Ohio (on his cell phone) when the contract was established (c. late 2009).

While staying in Ohio at his parents' home, Plaintiff was harassed by his Mother and Father on more than one occasion. Details supporting these assertions have been provided in two Ohio cases – one when Plaintiff was a respondent, another in a direct suit against Plaintiff's family in U.S.D.C., N.D. Ohio. The tense situation culminated in a physical confrontation between Plaintiff's father and Plaintiff in his father's garage and has been docketed in U.S.D.C., N.D. Cal's docket. As a result, Plaintiff's father refused to allow Plaintiff to reside in his and his Mother's home. Plaintiff entered an Akron, Ohio homeless shelter in mid. 2011 as a result.

Plaintiff believes his father and mother conspired – at the behest of defendant United States of America - to purposely enrage Plaintiff until such time as physical contact occurred. It was likely meant, yet again without Plaintiff's express consent, as training. The lesson is applicable to marital disagreements (where subtle yet overt harassment is used by a physically weaker party to enrage a physically stronger party); to employment scenarios (where a team of people make a person uncomfortable – even miserable - to force a departure or resignation); even to military encounters (where a nation or persons within a nation taunt or otherwise harass to invoke a military response, perhaps to drain fiscal reserves).

---

*Sutherland* (1954) 124 Cal. App. 2d 280, 290 [268 P.2d 754], it was observed that a defendant who was not a corporate director should "be liable for breach of fiduciary duty by colluding with a disloyal fiduciary without being a fiduciary himself." In *Bancroft-Whitney Co. v. Glen* (1966) 64 Cal. 2d 327, 353 [49 Cal.Rptr. 825, 411 P.2d 921, 24 A.L.R.3d 795], an unfair competition case, a party who "was aware of or ratified [another's] breach of his fiduciary duties, ... cooperated with [him] in the breach, and ... received the benefits of [his] infidelity" was held liable for participation in the breach of fiduciary duty."

Plaintiff now believes his stay at his parents' home – and the harassment endured – was planned. Conspiring parties include the University of Chicago; W.S.G.R., P.C.; and the U.S. Dept. of Justice. They conspired as a method of teaching the law.

If absurdity is the Court's initial response to this allegation, consider the aforementioned standard of applying the Rules of Federal Procedure to previous assertions and filings. In *Wright v. United States* (2013 N.D. Cal.), Case No. 13-05994-LB, Plaintiff insinuated that the C.I.A. or perhaps the U.S. Dept. of Justice drugged Plaintiff while he resided in a Motel 6 in Akron, Ohio in order to teach Plaintiff.

Pursuant to FRCP 8(B)(1)(b) and 8(b)(6), allegations that aren't denied are admitted.

In that case's initial Motion to Dismiss (ECF Doc #18 filed on March 7th, 2014) filed by defendant United States of America, opposing counsel did not deny Plaintiff's allegations.

Considering Rule 8, those facts[19] are therefore admitted.

Defendant United States did drug Plaintiff while he resided in the Motel 6 in Akron, Ohio. An F.T.C.A. claim was recognized as filed with the U.S. Dept. of Justice on or about April 7th, 2014 and Plaintiff sent the Department in Washington, D.C. another letter attempting to interpret the presumed lessons. The claim was for $14.9 MM.

In recollection and considering this newfound presumption of truthfulness under Rule 8 to what can only be described as unreal circumstances, Plaintiff began recalling Plaintiff's father's involvement with the United States government. He recalled a story where Plaintiff's father enrolled in the U.S. Naval Academy in the late 1960's. He left after odd circumstances and recalled to Plaintiff that he had engaged in some mischief. Plaintiff's father went to Bowling Green State University thereafter and apparently did not graduate. He met and married Plaintiff's mother.

---

[19] Black's Law, 10th Ed. defines allegations as "a declaration that something is true; esp. a statement, not yet proved, that someone has done something wrong." Plaintiff substitutes "facts" for allegations as Black's also defines facts as "an actual or alleged event." They are synonymous.

1    In 2014, Plaintiff recalled living at 1793 Sophia Lane in Hinckley, Ohio c. 1985-1990

2  (Plaintiff was born in 1973) and some odd circumstances with lessons relating to sex and the Catholic

3  church; parenting; and difficulty for children to bring up abuse.

4    Money and envy seem to have been topics.

5    Plaintiff recalls cement blocks.

6    Plaintiff recalls attending Western Reserve Academy with financial assistance offered by Mr.

7  John A. Wilson's (or so Plaintiff was told).  Plaintiff recalls his father's strength in the weight room –

8  his father bench-pressing 225 lbs. several times after not having been in the weight room in 20 years.

9  At the time, Plaintiff could not yet bench press 225 lbs. once.

10    Plaintiff recalls his own desire for children and what Plaintiff's father might have felt.

11  Plaintiff recalls visiting the buzzards in Hinckley, Ohio with his father.

12    Plaintiff recalls football games played and watched.

13    Some things didn't add up.

14    Sometime in 2013, Plaintiff discovered two cases (Case Nos. 08-CR-068 and 04-CR-030;

15  U.S.D.C., N.D. Ohio) filed by the United States Attorney in Cleveland, Ohio against various

16  personnel in the Cleveland scrap metal (recycling) industry.   Those cases were named in Case No.

17  13-05994-LB.  Plaintiff suggested in that 13-05994-LB case that perhaps Plaintiff's father was used

18  as leverage or perhaps Plaintiff's father had always worked for the U.S. Government in some

19  capacity.  Plaintiff recalls meeting some of the cases' named individuals.

20    After all facts were pieced together by Plaintiff, he believed it likely that Plaintiff's father

21  would have been employed by the U.S. Department of Labor or the U.S. Department of Justice in

22  order to penetrate and uncover possible racketeering or price-fixing in the scrap metal industry.

Unlikely, but possible.   Plaintiff contacted his father via e-mail asking him whether or not this was true and Plaintiff's father did not respond.

Plaintiff contends his father was an employee for a department of the United States and has, without Plaintiff's permission, allowed the United States to train Plaintiff via an immersion technique, which violates Plaintiff's civil rights [Thread of Rights to Privacy; Pursuit of Happiness; Preamble (U.S. Const.); see also 1 U.S.] and supports an allegation that Pops and defendant United States have engaged in a civil conspiracy[20].

Plaintiff believes R.I.C.O. violations could also be asserted.

<u>Mr. Daniel Waters – Ohio</u>

In Feb. 2013, Plaintiff attempted to gain pre-approval for a mortgage in Ohio.

In preparation, Plaintiff identified an erroneous tax lien on his credit report and attempted to remedy directly with Ohio's Attorney General.   His efforts over the next three months were not beneficial, so he sought legal representation.

On or about May 15th, 2013, Plaintiff retained Mr. Daniel Waters and his firm Waters Law LLC to engage the Ohio Dept. of Taxation in re: the erroneous tax lien that appeared on Plaintiff's credit reports (3 different bureaus).

Plaintiff worked with Mr. Waters over a 3-month timeframe.   Often times, Mr. Waters redirected the matter to not engage Ohio's Dept. of Taxation, but to work with credit departments and

---

[20] "All those who, in pursuance of a common plan to commit a tortious act, actively take part in it and further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or who ratify and adopt the acts done for their benefit, are equally liable with the wrongdoer." Rosenberg v Rosenberg Bros Special Account, 134 Mich App 342, 354, 351 NW2d 563 (1984) (quoting W. Prosser, Handbook of the Law of Torts §46, at 292 (4th ed 1971)). Once a civil conspiracy is established, "whatever was done in pursuance of it by one of the conspirators is to be considered as the act of all, and all are liable irrespective of the fact they did not actively participate therein." Brown v Brown, 338 Mich 492, 503, 61 NW2d 656 (1953) (quoting Warsop v Cole, 292 Mich 628, 291 NW 33 (1940)), cert denied, 348 US 816 (1954). However, "[i]t is only where means are employed, or purposes are accomplished, which are themselves tortious, that the conspirators who have not acted but have promoted the act will be held liable." W. Keeton, Prosser and Keeton on the Law of Torts §46, at 324 (5th ed 1984) (footnotes omitted).

1    fix the problem with those bureaus.  Plaintiff at first objected, then after being coerced, agreed to

2    abide by Mr. Waters' expert guidance.

3
         Mr. Waters also insisted, after Plaintiff retained him, that Plaintiff had to perform tasks such
4
     as contacting the credit bureaus himself and Plaintiff became irritated with Mr. Waters on several
5
6    occasions.

7         Plaintiff seemingly had to perform more work than Mr. Waters performed.

8         The tax lien notation is still on Plaintiffs' Equifax credit report and when Plaintiff contacted
9
     Mr. Waters to remedy, Mr. Waters simply stated that he had completed his job.  Mr. Waters never
10
11   contacted Ohio's Dept. of Taxation directly, which was the original reason for Plaintiff's hiring him.

12        A breach of contract claim in Ohio has four elements: (1) the existence of a contract; (2) the

13   plaintiff's performance; (3) the defendant's breach; and (4) the existence of damages. *Lebo v. IMPAC*

14   *FUNDING CORP., et al.* (N.D. Ohio, 2011); No. 11-01857 citing *Pavlovich v. Nat'l City Bank*, 435

15   F.3d 560, 565 (6th Cir. 2006) (quotations omitted).

16
         Plaintiff paid Mr. Waters about $200 upon hiring him in 2013 and Plaintiff performed all
17
18   tasks he was required to perform (phone contacts, supplying information).  In addition, defendant did

19   not secure the tax lien removal from Equifax and Plaintiff still maintains an inaccurate credit report

20   from that credit bureau (the damage).  Ancillary damages arise as Plaintiff is now indigent and owes

21   the State of Ohio for 2013 taxes which he cannot pay.  The State of Ohio may use previous

22   information (erroneous information) against him.  Had Mr. Waters engaged the State of Ohio
23
24   directly, such information would have been fixed.

25              Consolidated Claim – all named Entities and Individuals

26        Plaintiff now believes that every entity listed herein has engaged in a conspiracy, keeping

27   Plaintiff from earning his degree and becoming gainfully employed (at or above historically earned

28

levels, which, Plaintiff has argued, are greater than his documented and recorded A.G.I. indicates, see Ex. 9).

It is also possible these named individuals, and others, engaged in a pattern of conduct to:

    (1)  Force Plaintiff to California;

    (2)  Force Plaintiff into the Courts to sue on a *pro se* basis in order to re-evaluate his life circumstances (career, marriage, scholastic, and familial history) through a legal lense and, as such, teach him law.

Whatever the true intent, Plaintiff suggests no such agreement has been made where Plaintiff has agreed to endure such a course and method of learning, despite its depth and effect. In addition, the enacted conspiracy has prevented Plaintiff from pursuing his claims in Court with adequate counsel, caused tortious damages, kept Plaintiff from obtaining monetary gain, and thus enjoy life that monetary gain affords (a home, a car, freedom, pursuing family of his own, or just going to a bar or gym in pursuit of willing women).

## VIII.  UNIVERSITY OF CHICAGO PROFESSORS & STUDENTS

### Overview

Plaintiff is not entirely sure how to introduce this section, but considering his appreciation for advanced education, Plaintiff believes it worthy to speak in specificity re: the University, its mission, and his experience within the context of his goals.

He is also unsure as to the intent of his professor and administrative contacts behavior – to train, to truly defame, or to otherwise maliciously harm Plaintiff. From a legal perspective, Plaintiff suggests the Discovery process would, once again, be required in order to facilitate rightful disclosure of facts relating to University intent.

### Prof. David Altig

Plaintiff has described his interaction with Professor Altig in letters to Dean Edward Snyder as attached hereto (see Ex. 2). In general, Plaintiff's experience was quite positive, save Plaintiff's desire to spend more time with the Professor in order to embed economic brilliance – things of the monetary, fiscal, and otherwise prudent financial behavior.

Plaintiff does not see a reason to shed new light on similar facts, but does wish to bring up a strange recollection. It seems Plaintiff recalls a time when Prof. Altig entered the class and indicated displeasure with an unnamed member of a group. It is possible that a student Plaintiff was working with at the time defamed Plaintiff and caused this Professor to unduly judge Plaintiff. He does not know for sure, but considering what occurred that led Plaintiff to file Cook County, IL Case No. 2010-L0-04638, states it as a possible input to defamatory claims and again requires discovery.

If Plaintiff is correct that someone from his class submitted false and defamatory statements about Plaintiff and that information filtered among faculty and administrative personnel, Plaintiff maintains rights under Illinois statute for defamation and is likely still active under fraudulent concealment statutes.

Plaintiff isn't pleading a claim for defamation against an individual relating to this particular class until such time as depositions, affidavits, or other submissions are submitted by Defendant University of Chicago, so merely states such a possibility as support for Discovery.

## Prof. Linda Darragh

Plaintiff was most excited and has been the most excited about several primary areas of business curriculum: Entrepreneurship; their closely related fields (Venture Capital, Private Equity); and Marketing Strategy. Both classes (Entrepreneurship, Marketing Strategy) he took might weave creative ability, free thought, and macro-level business principles and map to what Plaintiff believed to be his core strengths – perhaps the very reason for his admission to the school.

As per the attached Ex. 2, Prof. Darragh felt the need to have Plaintiff work on a project that mirrored – save for the size, complexity and scope being approx. $1/10^{th}$ of what he had been paid to do in his career – work he performed for Ariba and Oracle Corporation. In other words, Plaintiff departed a paying career where clients routinely paid between \$275/hr-\$325/hr for his effort and replaced it with a project where he performed many of the same tasks, but instead of being paid, he paid the school. Plaintiff was disappointed and sent Ex. 2 to the school after departing.

It is possible (once again, Discovery would be required) that Ms. Darragh learned of his complaints and retaliated against Plaintiff. In other words, the defamation that was displayed on his transcript (which was sent to Ohio State and Stanford Univ. c. 2009-2010) indicating he was on a forced absence was made in retaliation for the review Plaintiff conducted of Ms. Darragh's class and Plaintiff's disappointment in both his assignment and having to pay for the class.

It is also possible that Ms. Darragh and other professors and administrators discriminated against Plaintiff [Plaintiff is male and Caucasian; many of the people Plaintiff believes may have defamed him are female and/or non-Caucasian]. It is also possible that Prof. Darragh desired to keep Plaintiff from pursuing advanced income by pushing him into non-profit or tasks that would prevent him from pursuing a position that offered advanced income (which was, and is, his focus).

<u>Prof. Abroo</u>

Plaintiff took a Marketing Strategy class with this professor and recalls one class where Prof. Abroo snapped at him in front of about 30 other students. Plaintiff inferred Maslow's Hierarchy of Needs as applicable to a discussion and when he introduced the topic, this professor snapped at him saying something about an "ugly flower." The statement was so strange Plaintiff was unsure of her intent. Was the professor was calling Plaintiff ugly?

As flowers often denote a feminine quality, perhaps Prof. Abroo was implying that Plaintiff believed this professor was an "ugly flower." Perhaps she thought of herself as an ugly flower. Whatever the case, the comment was made abruptly, harshly and had the effect of quieting Plaintiff, who was already carrying a bag full of claims against former employers and close-to-Chicago entities; claims which harmed his self-confidence and reputation. He did not need additional discomfort, harassing conditions, defamatory conduct, or scheming entities preventing him from enjoying a classroom, University, knowledge enrichment, and personal growth.

It is also possible that Ms. Abroo and other professors or other administrators discriminated against Plaintiff (Plaintiff is male and Caucasian, Ms. Abroo is female and appears of Indian descent). It is also possible that Prof. Abroo desired to keep Plaintiff from pursuing advanced income by preventing him from pursuing his strengths, perhaps offering those possibilities to women or those of similar descent as she.

Investments

Plaintiff does not recall this particular professor's name, but Plaintiff recalls signing up for this class despite not maintaining one of the prerequisites. The question here is – how did he become enrolled in a course when he did not maintain the prerequisite? Nevertheless, once enrolled in the class and despite not having the required prerequisites, Plaintiff recalls witnessing a PowerPoint presentation offered by this professor (also employed by Goldman Sachs) where complicated mathematical formulas were being discussed. Plaintiff recalls seeing them and, in the context of the proposed problem, there was no need for such a formula. The problem could have been easily solved utilizing the mathematical concept of weighted averages.

Evaluation, Intent, Effect & Lessons Learned

The effect of professor and administrator conduct created a wrongful and untruthful appearance in stark contradiction to reality.   Administrators and professors conspired (via doctoring a transcript, via selective citations within a Dean's letter) to make Plaintiff appear inept, unintelligent, and dishonorable.   The rumor in the school likely circulated: "He is not smart enough to attend the school, did not do the work required; he cheated."

The truth?   Professors and administrators were involved in the apparent conspiracy.   The psychological effect of the Investments class was to map the image of Goldman Sachs to a sort of pain-via-complication method in order to dissuade Plaintiff from pursuing those positions, positions which afford high income and a high quality of life.

A similar method was deployed in Entrepreneurship and Marketing Strategy – make Plaintiff's experience miserable.   The fact that Plaintiff maintained an inaccurate transcript which was sent to various other Universities, innuendo of suspension on that transcript, and an unexplainable gap in his resume suggests – at the very least – the need for Discovery and disclosure of either explicit admission of these facts or denial thereto.   Based upon presumed admission of facts, additional claims for retaliation subject to tort damages in Illinois are likely.

Plaintiff – currently buried and surrounded by public misdeeds and almost daily harassment, often thinks about burying these professors in 8 years (as per punitive ratios) of homeless shelter life. Force them to write papers: "teach" them; punish them.   Why? Because that is what Plaintiff has had to endure as a direct result of the collective's misdeed: an enormously intricate, planned and effective assault on Plaintiff's character, career, and ability to create and maintain a family.    Deceit surrounds every portion of this suit. The effect – Plaintiff's poverty, damaged reputation, lack of a family – was the intent.   And it is all based on lies perpetrated by defendants.

But let's afford a slightly alternate path.

Let's say that all these situational descriptions were valid and that these professors wanted Plaintiff to feel this pain or otherwise attempt to interpret; a slightly different method of teaching. One of the lessons was to understand the importance of disclosure and discovery [see *California Federal Civil Procedure Before Trial*, The Rutter Group (2014), Ch. 11]. One can't settle a suit before all of the facts are discovered – other claims might reside within that discovery process.

Another lesson stems from accountability inherent within educational institutions, especially highly competitive institutions and those at the graduate level. There is as much risk in educational management and the issues seem to mirror those in corporate governance; especially issues faced by high-profile Fortune 500 companies.

Plaintiff can think of three primary divisions with corporations that require teamwork, sportsmanship, and demand some level of accountability and reasonable temperament in order to manage culture, rewards, people – as opposed to pure financial performance. Those functions include line of business management (i.e. – Sales Management; Consulting Management) as well as Human Resources and Legal. If financial performance were the sole measure, slavery is the most effective course. Low salaries and few benefits elevate profit and thus stock price. Simply remove the need to pay people. The difficulty resides in what's fair and reasonable for a given job and its expectations, its tasks. Firms like Towers Perrin are built around these challenges and maintain extraordinary levels of intellectual property.

In this particular case study, if we view it as such, these professors and administrators all erred in some way. Assuming Plaintiff's interpretations are accurate – that another student lied about Plaintiff doing something he should not have been doing in Economics, Professor Altig generally announced but did not specifically address a student he had heard rumors about. The error in his

method is that Prof. Altig did not permit the student (let's say it was Plaintiff) to confront and refute the alleged misdeed, in private.

Professor Abroo's mistake was more obvious – snapping at a student she perhaps disliked for some reason – be that race, gender, or just the student's general look and demeanor – judging what she did not truly know. A similar mistake was made by Prof. Darragh – the worst mistake of all. To place Plaintiff in a project that was 1/10th of his capability; a project that taught him nothing; a project that made him feel inferior and further reduced earned levels of – for lack of a better term, stature – was in direct opposition to the very purpose of his pursuing graduate school.

Everyone at the school has an expectation of advancement. Everyone there likely maintains a steady competitive streak; everyone there has worked diligently, is capable, is there for a purpose. So don't ever do what these professors appeared to do. Don't do it to your employees in business; don't do it to fellow students or professors; don't do it to anyone. That is not say one must be best friends with all people nor tolerate harassment, but it is to say that a certain level of respect and treatment is expected and due one another upon first meeting.

If Plaintiff's claim for damages is accurate (regarding lost profits and defamation relief damage amounts), complaints like this one can do harm. 100 students with this identical claim in the same year? 1,000 employees?

So let's just say that was the lesson.

Plaintiff seeks stipulation by the University of Chicago as to these facts and subsequent interpretation. Of course, the University and Dean Snyder will still need to comment on what purpose 4 years in homeless shelters and substandard (i.e. – condemnable housing) has served, but perhaps we'll leave that to Discovery. They will have a bit of explaining to do and quite a bit of apologetic discourse will be expected.

In other words, if this was and is a case study, it was enacted with a mighty high price tag.

## Theoretical Interpretation

Rule 8 has been leveraged in several different scenarios:

a.  to uncover Plaintiff's previous assertions that he was underpaid (by about $100,000 per year beginning c. 2001),

b.  to identify defamation claims against a particular person at Oracle Corporation and gain concurrence that he was an "exceptional business performer",

c.  to identify United States' involvement in his life without his express consent;

d.  to assert that his father was likely an employee of the United States government;

e.  to remind the Court that no technical pleading form is required [FRCP 8(d)(1)];

f.  to remind the court that "pleadings are to be construed so as to do justice" See FRCP 8(e).

The assertions were developed by marrying situational realization to the Court's own rules of procedure.   Who knew one may grow to appreciate such procedure?   If such assertions truly are accurate, the mind begins applying the same improbability afforded via Rule 8 to other events.

As one example, Plaintiff recalled earning 4 athletic letters during high school, his recollection occurring several months ago.  Plaintiff appeared in the required number of quarters his freshman year in football, yet he received only three letters for his sophomore thru senior years.  A Western Reserve Academy blanket is awarded 4 year letter-people and, upon graduating, Plaintiff did not receive one.   He also recalls meeting with the Headmaster just before graduation in 1992, the man using the Power of his office to embed forced gratitude and indebtedness.   "You owe!"

Plaintiff recalls his test scores and his study methods.  He recalled being admitted to, but not being able to attend, Cornell University.   He took the LSAT in 2011, meant not necessarily for performance but more as a Sudoku-like exercise, something to do to keep the mind occupied.

1    The score was remarkably and suspiciously low.

2    If the C.I.A. and/or the U.S. DOJ did drug Plaintiff in 2011 in that Akron, Ohio Motel 6 to train him without his express permission, if the United States has been involved in his life for years, how early and it what ways have they been involved?

Test scores.

The United States has kept Plaintiff's test scores low – adjusted in the transcripts – perhaps in order to temper confidence, to keep Plaintiff obedient, to withhold his earnings and offer that life to others.   To prevent a life he earned.

Plaintiff does not owe, but Plaintiff is most due an explanation, an apology, an adjustment to record and reputation…and yes, money.

//

## IX. DAMAGES

### Endured Life Harm

In general, Plaintiff suggests he has endured life harm including marital harm; loss of self esteem; reputational harm; credit harm (score of 780 to score of @ 500); relationship harm; personal injury (2007, Illinois; 2010-2011, Ohio; 2013-2014, California); skill deprivation (subject to review); monetary and non-monetary property loss; opportunity loss (personal income at calculated levels); deferment of life enjoyment; deferment of children and nuclear family with Plaintiff as parent; degree postponement; lack of intimacy; and other harm.

2013-2014 injuries Plaintiff sustained in California (see 14-00353-RS; N.D. Cal.; ECF Doc #56, Ex. 1-44) would not have been endured had Plaintiff's claims been rightfully pursued…

   a)  in 2006 by Hughes or Berger Shatz;

   b)  in 2008 by Mr. Pugh or Mr. Breen or their former firm(s);

   c)  in 2008 by Mr. Alvarez, then of W.S.G.R.;

   d)  in 2008 by Mr. Snyder or the University of Chicago;

   e)  in 2009 by his bankruptcy attorney;

   f)  in 2010 as a result of Plaintiff's Ohio lawsuits or by appointed counsel under § 1915(e);

   g)  and ancillary 2013-2014 efforts in California.

### Breach of Fiduciary Duty

In actions against fiduciaries, a plaintiff may have the option of pursuing either legal or equitable remedies. *Van de Kamp v. Bank of America* 204 Cal.App.3d 819, 863. "Recovery for damages based upon breach of fiduciary duty is controlled by Civil Code §3333[21], the traditional tort recovery. This is actually broader in some instances than damages which may be recovered for

---

[21] For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could be anticipated or not.

1    fraud." *Michelson v. Hamada* (1994) 29.Cal.App.4th 1566, 1582.  While breach of fiduciary duty

2    normally presents a question of fact, the existence of legal duty in the first instance and its scope are

3    questions of law that the court must decide.  *Kirschner Brothers Oil, Inc. v. Natomas Co.* (1986)

4    185.Cal.App.3rd 784, 790 (quotations omitted).

5

6        "When a trustee breaches a trust agreement, whether willfully, negligently, or by oversight,

7    he or she is liable for any loss…resulting from the breach and must place the beneficiaries in the

8    position they would have held had the breach not occurred." *Stuart v. Continental Illinois National*

9    *Bank & Trust Company of Chicago,* 68 Ill.2d 502, 369 N.E.2d 1262, 1272, (1977); *Parish v. Parish,*

10   29 Ill.2d 141, 193 N.E.2d 761, 766 (1963).

11

12       Prejudgment interest may be recovered when warranted by equitable considerations and

13   disallowed if such an award would not comport with justice and equity. *Jones v. Hryn Development,*

14   *Inc.,* 334 Ill.App.3d 413, 778 N.E.2d 245 (1st Dist. 2002), citing *Finley v. Finley,* 81 Ill.2d 317, 410

15   N.E.2d 12, 19, 43 Ill.Dec. 12 (1980).

16                                  <u>Breach of Contract – Ohio</u>

17

18       "The most prevalent remedy for a breach of contract is to require the party who breached the

19   contract to pay damages to the non-breaching party.  In some instances, the injured party can compel

20   specific performance of the contract, or have the contract modified or cancelled.  Sometimes, an

21   order can be obtained from the Court to prevent further loss." Most often, the best remedy for breach

22   of contracts is money damages for the loss the breach of the contract caused.  The breaching party's

23   liability is not necessarily the contract price or the value of the contract.  The non-breaching party

24   may be entitled to additional damages. *Cincinnati Bar Association*, <u>http://www.cincybar.org</u>.

25

26   //

27

28

Breach of Contract - California

A breach of express contract is not the only basis for recovering breach of contract damages, a breach of the covenant of good faith and fair dealing implied in every contract is also a breach for which damages may be recovered. *Pasadena Live LLC v. City of Pasadena* (2004) 114 C.A.4[th] 1089. Moreover, a breach of contract may involve conduct that gives rise to other causes of action which different damage principles apply. See *Robinson Helicopter v. Dana Corp.* (2004) 34 CA4th 979 (economic loss rule did not bar fraud and misrepresentation claims, which the supreme court held were independent of breach of contract). State of California Bar Association's *California Attorney's Guide to Damages*, §1.15.

Cal. Civ. Code Sec. 3300 is the general measure of damages for breach of contract. It provides that the measure is the amount that will compensate the aggrieved party for all the detriment proximately caused by the breach or that in the ordinary course of things would be likely to result from it.

Civil Code §3301 prohibits speculative damages by providing that damages must be clearly ascertainable in both their nature and origin. Civ. Code Sec. 3358 provides that a plaintiff cannot recover a greater amount in damages than he or she could have gained by the full performance of the contract. State of California Bar Association's *California Attorney's Guide to Damages*, §1.17.

California courts have held that the foreseeability test of Hadley...is incorporated into CC Sec. 3300. *Hunt Bros. v. San Lorenzo Water Co.* (1906) 150 C 51. See also *Millikan v. American Spectrum Real Estate Servs.* (2004) Cal., Inc. 117 CA4th 1094, 1104 (foreseeability requires only reason to foresee; not actual foresight); *Sun Maid Raisin Growers v. Victor Packing Co.* (1983) 146 CA3d 787 (foreseeability is normally question of fact...). *California Attorney's Guide to Damages*, §1.18.

The plaintiff may recover the loss of profits he or she would have received had the contract been fully performed. See *Buxbom v. Smith* (1994) 23 C2d 535. Recovery of profits lost by a...business...is available if the extent and occurrence of those lost profits can be ascertained with reasonable certainty, even though the amount can be shown with mathematical precision. *California Attorney's Guide to Damages*, §1.19 citing *Sargon Enters., Inc. v. University of S. Cal.* (2012) 55 C4th 747, 773.

In the absence of an express contractual provision for interest, CC Sec. 3287(a) states the general rule on the right to recover interest for breach of contract if the damages are certain or are capable of being made certain by calculation. The rate of interest in such cases is **10 percent**. CC Sec. 3289. Sec. 3287(a) does not apply when the pre-judgment interest is part of the contractual amount owed. *California Attorney's Guide to Damages*, §1.20.

Civil Code §3294(a) provides that a plaintiff in an action not arising from breach of contract may recover exemplary damages (often referred to as punitive damages) when the defendant has been guilty of oppression, fraud, or malice (those terms are defined in Sec. 3294). *California Attorney's Guide to Damages*, §1.34 citing *City of Hope Nat'l Med. Ctr. V. Genentech, Inc.* (2008) 43 C4th 375, 392; *Cates Constr., Inc. v. Talbot Partners* (1999) 21 C4th 28, 61; *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 C4th 85, 102.

*California Attorney's Guide to Damages*, §§ 1.39-1.41 cover employment cases and rights to damages under breach of contract claims and suggest rights to back pay are reasonable remedy. Generally, a party who suffers damages from a breach of contract must do all the party reasonably can do to mitigate the party's damages [*Johnson v. Comptoir* (1955) 135 CA2d 683], but the party may recover as mitigation damages the costs of such attempts [*Millikan v. American Real Estate Servs. Cal., Inc.* (2004) 117 CA4th, 1094, 1105].

<u>Breach of Contract - Illinois</u>

It appears remedy for breaches of contract under Illinois law (re: breach of goods contracts) are similar to contracts relating to providing service (which a University may provide). Therefore, it seems 810 ILCS 5/2-601 is applicable where "if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may (a) reject the whole; or (b) accept the whole; or (c) accept any commercial units and reject the rest…"

"Illinois law recognizes the availability of a remedy for monetary damages for a private school's wrongful expulsion of a student in violation of its contract." *Bloch v. Hillel Torah North Suburban Day School* (1st Dist. 1981) 100 Ill.App.3d 204, 206.

A buyer's incidental and consequential damages are covered in 5/2-715 where "(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach. (2) Consequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise;…"

<u>Tort – Illinois</u>

Plaintiff notes *Masi v. Ford City Bank and Trust Co.* (7th Cir. 1985) 779 F.2d 397, 398-401 as pertinent to damages claims for breach of fiduciary duty or other torts claimed based on incidents in Illinois.

"It has long been established in this state that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the

defendant acts willfully, or with such gross negligence as to indicate a wanton disregard for rights of others.  *Consolidated Coal Co. v. Haenni* (1893), 146 Ill.614, 35 N.E. 162.  Where punitive damages may be assessed, they are allowed in the nature of punishment and as a warning and example to others from committing like offenses in the future.  *Eshelman v. Rawalt* (1921) 298 Ill. 192, 197, 131 N.E. 675).  And, while the measurement of the damages is a jury question, the preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law.  *Knierim v. Izzo* (1961), 22 Ill.2d 73, 87, 174 N.E.2d 157." *Id* at 400.

      *Masi* cites several cases, one which awarded claims from one set of facts for both breach of contract and breach of fiduciary duty, when the issue of whether or not a fiduciary relationship was in place was apparent.  In that case, "the court found that exemplary damages were proper since the breach of fiduciary relationship constituted a separate and independent tort." *Id* at 400 citing *Allabastro v. Cummins* (1980), 45 Ill.Dec. at 756, 413 N.E.2d, at 89.

//

1

<u>Defamation – California</u>

2

      1.     General Damages

3

4

     A discussion of whether defamation requires special damage pleading arises from whether or not the defamatory matter can be interpreted as such on its face. *California Tort Damages*,

5

6

Continuing Education of the Bar (2014), §§ 8.2-8.3.   In determining whether a libel is defamatory

7

on its face, courts look to the natural and probable effect that the publication has on the mind of the

8

average reader. *MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 547.   *See Couch v. San*

9

*Juan Unified School District* (1995) 33 Cal.App.4th 1491, 1500.

10

11

     In defamation contexts, general damages are damages for 'loss of reputation, shame,

12

modification and hurt feelings.'"  Cal. Civ. Code §48(4)(a).  Thus general damages essentially

13

compensate the defamed plaintiff for emotional distress and damages to reputation. *California Guide*

14

*to Tort Damages*, Continuing Education of the Bar, § 8.8 quoting *Douglas v. Janis* (1974) 43

15

Cal.App.3d 931, 940.   See generally Sanford, Libel and Privacy (2d ed 1991).

16

17

     In "torts committed by the breaching party... damages may be awarded." *California Attorney's*

18

*Guide to Damages* (2013), Continuing Education of the Bar §1.15.

19

      2.     Nominal Damages

20

     In the absence of Court agreement to general damages, nominal damages may apply

21

herein in order to correct the matter – a few dollars to compensate the Plaintiff for actual damage

22

done.  Nominal damages allow the victim to "vindicate his or her reputation," but are not available

23

24

"when other damages are imposed." *California Guide to Tort Damages*, Continuing Education of the

25

Bar (2014), §8.10.

26

      3.     Punitive Damages

27

     Punitive damages for defamation can be recovered if special criteria are met.  *See Agarwal v.*

28

*Johnson* (1979) 25C3d 932, 947.   Such damages are usually for "the sake of example and by way of

1    punishing a defendant." Cal. Civ. Code §48a(4)(c).  See *Schomer v. Smidt* (1980) 113 CA3d 828,

2    836 (punitive damages are for purpose of punishing wrongdoer and deterring further misconduct).

3    Punitive damages are generally awarded in addition to, not in place of, general, special, or nominal

4    damages.  See *Kuge v. O'Gara* (1964) 227 CA2d 207, 209.

5    
6          The recovery of punitive damages in defamation cases generally requires a showing that the

7    defendant acted with a) malice (or oppression or fraud); b) actual malice; and c) the constitutionally

8    required "knowing falsity or reckless disregard for the truth" if defamation damages would inhibit

9    constitutionally protected speech. *California Guide to Tort Damages*, Continuing Education of the

10   Bar (2014), §8.11.

11   
12   //

13   
14   
15   
16   
17   
18   
19   
20   
21   
22   
23   
24   
25   
26   
27   
28

## X. RELIEF REQUEST(S)

### Suggested Two-Stage Relief Process

Plaintiff is requesting a 2 stage preliminary relief process. The first stage merely requests that appearances are filed by all parties. Plaintiff requests Plaintiff's father attach – to his appearance – the letter from Cornell University that still resides in Plaintiff's personal file at his father's home.

After defendant appearances are filed, Plaintiff will file a pre-trial management conference Motion. As many parties are listed as defendants, Plaintiff will only be able to respond to one at a time. Considering indigence, homelessness, and the administrative difficulties those circumstances bring, the request is not only reasonable, but necessary.

### Suggested Relief – Stage 1

Plaintiff contends that Pre-Trial conferences governed by Fed. Rule Civ. Proc 16 and 26 serve the best interests of justice in this matter, before any Motions to Dismiss may be filed. Pursuant to Rule 16, "…the court may order the attorneys and any unrepresented parties to appear for one or more pretrial conferences for such purposes as: (1) expediting disposition of the action; (2) establishing early and continuing control…; (3) discouraging wasteful pretrial activities; (4) improving the quality of the trial…; and (5) facilitating settlement."

As such, Plaintiff suggests the following process to both opposing counsel and the Court:



Plaintiff will be requesting an initial in-person appearance with his father as initial step in this action, subject to stipulation and agreement by Plaintiff's father. Plaintiff believes rapid remedy can be achieved with Plaintiff's father upon personal pre-trial conference.

<u>Preliminary Relief Requests – Stage 2</u>

In the interest of preparing opposing counsel, Plaintiff provides preliminarily requested relief he is entitled to under Illinois, California, or Ohio contract and tort law. Plaintiff seeks leave to adjust relief demands.

Hughes

(1) As per specific performance (see 810 ILCS 5/2-716) of the Plaintiff-Hughes contract, an in-person meeting with Hughes in a San Francisco location in advance to any Hughes filings (save an appearance);

(2) Disclosure of all facts contained and implied herein to be docketed in this Court;

(3) Representation regarding other matters, if needed;

(4) Compensatory damages of $15,000 relating to marital property;

(5) For deferment of life enjoyment from claims Plaintiff maintained during Hughes' representation, compensatory damages of $1,000,000 (see U of C calculations in this section);

(6) Exemplary award (2:1 ratio) of $2,000,000;

(7) Damages adjusted as the Court sees appropriate and;

(8) Attorney's Fees and costs.

Berger Shatz

(9) An in-person meeting with Berger Shatz in a San Francisco location;

(10)    Assistance supporting an in-person meeting with Plaintiff's former wife;

(11)    Disclosure of all facts contained and implied herein to be docketed in this Court;

(12)    Representation regarding other matters, if needed;

(13)    Damage award as the Court sees appropriate and;

(14)    Attorney's Fees and costs.

### Request(s) for Relief from Breen Pugh

(15)    Completion of the contract regarding representation including filing claims or lawsuits Plaintiff has asserted and maintained at the time of Breen & Pugh's retention in 2007-2008 or substitute services to perform those tasks at Plaintiff's discretion;

(16)    Representation regarding criminal allegations and record correction in re: Case No. 2480252 [San Francisco Superior Court, CA];

(17)    Representation regarding other matters, if needed;

(18)    For deferment of life enjoyment from claims Plaintiff maintained during Breen & Pugh's representation, compensatory damages of $3,000,000 (see U of C calculations in this section which do not include claims against Oracle Corp.);

(19)    Exemplary award (2:1 ratio) of $6,000,000;

(20)    Damages adjusted as the Court sees most appropriate;

(21)    Attorney's Fees and costs;

### Request(s) for Relief from Mr. Fred W. Alvarez of Jones Day

(22)    In-person meetings to be scheduled by the Court for factual disclosure purposes;

(23)    Civil representation regarding civil claims against former employers and ancillary claims/lawsuits, if needed (Plaintiff could, perhaps, work within this firm with guidance offered by Mr. Alvarez);

(24)    Financial relief as the Court sees appropriate;

(25)    Attorney's Fees and costs.

1

## Requests for Relief from W.S.G.R., P.C.

2   (26)    Disclosure of all facts contained and implied herein to be docketed in this

3         Court;

4

5   (27)    Civil representation regarding civil claims against former employers and

6         ancillary claims/lawsuits, if needed  (Plaintiff could, perhaps, work within this firm

7         with guidance offered by a partner or group thereof);

8   (28)    Financial relief as the Court sees appropriate;

9   (29)    Attorney's Fees and costs.

10

// 11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Requests for Relief from University of Chicago</u>

Plaintiff's preliminary relief requests cover two areas of claims for damages – one stemming from contract, the other from tort.

Where two interpretations of a contract exist "one of which is reasonable and fair, and the other is unreasonable and unfair, the latter interpretation must be rejected and the first accepted." *Molybdenum Corp. of America v. Kasey* (Cal. App. 1959) 1 Cal.Rptr. 400 citing *Division of Labor L. Enforcement v. Safeway Stores* (1950) 96 Cal.App.2d 481, 490 [3] [215 P.2d 773].   Plaintiff suggests the requested relief a very reasonable interpretation regarding University policy (i.e. – performance of the disciplinary hearing at the first available opportunity).

It would have made sense for the University of Chicago to invite Plaintiff to discuss his claims and external circumstances causing Plaintiff some level of difficulty and begin its own internal investigatory process regarding faculty and students Plaintiff maintained claims against.  In addition, it might have made sense to introduce Plaintiff to a law firm (i.e. – Jones Day; W.S.G.R.) who might assist him or even place Plaintiff in the University's Law School.   Since they did not, Plaintiff suggests he is entitled to either the performance of their implied or explicit contractual obligations or substituted services.  He is also entitled to tortious relief as per *Masi*, supra.

A. *Relief for Breach of Contract*

    a. *Performance of Contract[22] or Substituted Performance*

Due to the fact the University did not conduct a hearing or otherwise investigate the matter thoroughly, Plaintiff expects the full performance of that contractual term.  In other words, Plaintiff is entitled to his disciplinary hearing within the School's confines (or other reasonable hearing and investigatory procedure) and demands such hearing at the school's earliest opportunity.

---

[22] See 810 ILCS 5/Art. 2, Pt. 7 for contract remedies generally, see 810 ILCS 5/2-716 for specific performance.

As Plaintiff did not breach the honor code or perform other violation(s), he expects reinstatement as the outcome of that hearing, with credit-in-lieu earned and retains the right to transfer credit to another institution of equal ranking (as per substitution implication of the Illinois statute governing claims for contractual breaches).

      b. *Lost Profits*

Due to harm Plaintiff has experienced to date, Plaintiff is entitled to monetary damages (*Broch,* supra) due to lost profits caused by defendants' breach. In other words, where degree conferment and placement might have afforded Plaintiff income and career opportunity, such opportunity was replaced with manual labor and retail auto-sale employment offering income of approx. $40,000 per year. Plaintiff also lived in substandard housing – perhaps condemnable housing – and homeless shelters for 4 years.

Plaintiff's former income peaked at $171,000 per year (2007 S.S.I. Wages), but he has claimed and supported demands for back pay from former employers based on earned annual income of between $250,000-$325,000 [see *Swartz v. Oracle Corporation, et al.* (2011, N.D. Ohio); 5:11-CV-00168-SL; ECF Doc. #6].

Those claims were not disputed by his former employers.

Under Rule 8 of the Fed. Rules of Civ. Proc., those undisputed factual allegations are thus taken as admitted [see FRCP 8(b)(1)(B) and FRCP 8(b)(6)]. Plaintiff's lost income of at least that amount plus any increases that may have been gained from placement in a new firm and an MBA or joint degree might have awarded is due. For guidance as to what might have been earned, Plaintiff maintains a secondary school colleague made $746,000 working for a venture capital firm. That colleague graduated from University of Pennsylvania's Wharton program and recently ran for Governor of the State of California.

What were Plaintiff's lost profits as a result of defendants' breach?

It is reasonable to assume that upon degree conferment, Plaintiff would at least be able to retrieve his value – approximately $325,000 per year – from an employer.   Taking into consideration the delay in recruitment and subsequent placement and assuming Plaintiff was moved into a full time program following Plaintiff's April, 2008 requests (into the next available program beg. Aug. 2008) and given legal counsel to pursue claims, Plaintiff suggests this amount would be effective approximately 3 months after graduation, or c. Sept. 2011 (as his full-time 3-yr. program would have concluded c. June, 2011).

Please see the chart below.

| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Salary and Bonus - Post-Tax | | | | | | 300000 | 300000 | 300000 | 900000 |
| Int. as per CC Sec. 3289 (subj. to IL adjust) | | | | | | 10% | 10% | 10% | |
| Calc Interest | | Ent. Into Full Time and | | | | 30000 | 30000 | 30000 | 60000 |
| 401(k) Contrib. - % | | Law Firm Assistance | | | | | | | |
| Annual 401(k) Contrib. - Amt. | | Acquired. | | | | $15,000 | $16,000 | $17,000 | |
| EOY Balance | | | | | | $15,000 | $31,000 | $48,000 | |
| Annual Invest. Inc. from Prev. Yr. - % | | | | | | | 10% | 10% | |
| Investment Income w/l 401(k) | | | | | | $ 1,500 | $ 3,100 | | $  4,600 |
| | | | | | | | | *Est. Lost Profits* | $ 964,600 |

Therefore, Plaintiff requests a tax-exempt damage award of $964,600 for lost profits.

*B. Tortious Damages*

    *a. Defamation*

Plaintiff is leveraging Illinois guidance for breach of fiduciary duty and California law to interpret defamation damages (under republication assertions), subject to correction via supplemental filing or amended complaint.

In a related 1974 case, the Plaintiff was awarded $50,000 for slander relating to his employment and reputation and could recover costs.  The judgment was affirmed by the State's Second Appellate District.  See *Douglas v. Janis* (1974), 43 Cal. App. 3d 935.

Due to the nature of the violation (level of breached trust) and adjusting for inflation, Plaintiff requests damages of $110,402 and a punitive amount inclusive of a 5:1 ratio, or $552,000 is hereby demanded, plus costs and attorneys fees as the Court sees appropriate.

  *b. Breach of Fiduciary Duty*

For breach of fiduciary duty, Plaintiff contends that Plaintiff's damages were not just lost profits and reputational harm, but include the delay in recovering damages due him from previous employers and attorneys. Therefore, Plaintiff is including a % of what he expects he might have recovered from those entities and individuals, subject to jury or the Court's adjustment.

Pursuant to this Complaint's Exhibit 10, Plaintiff contends he would have received approx. $5.18 MM from employers. Assuming that relief request was reasonable and assuming the University would have appointed counsel or otherwise assisted Plaintiff in re: these pursuits, a reasonable delay in award of approx. 3 years from June, 2008 (affording time for law firm review and discovery, complaint initiation, and subsequent trial or settlement) puts life enjoyment of that award at mid-2011.

Assuming Plaintiff invested in the S&P 500 on July 3rd, 2011, lived upon 3% of the balance until 2014 and upon Dec. 7th, 2014 he withdrew or otherwise spent 80% of the investment's increase during that timeframe (increase of $2.765 MM), Plaintiff's "enjoyment" is exhibited below.

| Breach of Fiduciary Duty | 2011 | 2012 | 2013 | 2014 | Dec. 8th, 2014 |
|---|---|---|---|---|---|
| Due from Employers | $ 5,180,382 | $5,180,382 | | | $ 5,180,382 |
| S&P 500 Return - 2011 to 2014 | 2011 to 2014 - (July 3rd, 2011) to (Dec. 8th, 2014) | | | | 53% |
| Net Inc. in Savings | | | | | $ 2,765,699 |
| Adjust. | | | | | 80% |
| Enjoyment - % | 1.5% | 3% | | | |
| Calc. $ Amt. of Enjoyment | 77705.73737 | $ 155,411 | $ 155,411 | $ 155,411 | $ 2,367,971 |
| | | | | Total: | $ 2,911,911 |

1    Although several assumptions are made, Plaintiff asserts a claim for compensatory relief of

2    $2.912 MM for the school's breach of fiduciary duty.   Relief for punitive damages, although guided

3    by *Masi, supra* to be awarded by a jury, are requested using a 2:1 ratio, or approx. $6 MM.

4    Total relief amount for breach of fiduciary duty is therefore $8.9 MM plus costs and attorneys

5

6    fees.

7    *C. Total Damages*

8    The total claim for relief from University of Chicago (tort and contract) is approx. $10,500,000

9    plus costs and attorneys fees.

10    Relief from Mr. Edward Snyder; Mr. Michael Boskin; and University of Chicago

11    Once again, the relief herein stems from a desire to obtain what Plaintiff is rightfully due, in-

12    person meetings and review of work for credit (performance of contractual obligations).

13

14    Under contract law, the right to full performance of the contract or substituted services is

15    required as well as damages.   For torts endured, monetary damages are demanded.

16    Each of these named person(s) or institutions is in a position of both indebtedness to Plaintiff

17    (to listen to presentations, to review Plaintiff's work), subject to bias and conflicts of interest.

18

19    Therefore, it is reasonable to expect some adjustment to these requests (i.e. – substituted services;

20    transfer of credit) to other institutions *of equal standing*.   The decision – after options are discussed –

21    is completely Plaintiff's.

22    (30)      Pending outcome of the disciplinary proceeding, Plaintiff demands meetings

23        with Mr. Snyder of Yale University, University of Chicago professors and

24        administrators, and Mr. Boskin to:

25

26        a.  Discuss school(s)  representing Plaintiff if the matter(s) herein or related

27            matters if they need to be continued in Court;

28

b.  Discuss Stanford University and Mr. Snyder and/or University of Chicago reviewing Plaintiff's independent work, assisting Plaintiff with his business plan (Plaintiff presentation, investment into, review for credit, assessment of "level of understanding" re: Hospitality and R.E.I.T.s;

c.  Review Plaintiff's application to JD/MBA program to Stanford University (as per Mr. Michael Boskin's involvement) for reconsideration for credit in-lieu (see Case No. 13-04457-EMC, Doc #1, pgs. 26-55);

d.  Review completed work for degree conferment, if earned;

e.  Factual disclosure from all parties;

f.  Correction of educational record (University of Chicago);

g.  Assist Plaintiff in career placement options;

h.  Other relief, as may be justified and ordered by the Court;

(31)    From Mr. Michael Boskin, compensatory award of $5,000 for travel and incidental;

(32)    From Mr. Michael Boskin, Punitive award of $10,000 (2:1 ratio);

(33)    From Mr. Snyder, compensatory award of $110,000 or as the Court sees reasonable;

(34)    From Mr. Snyder, punitive damages of $550,000 or as the Court sees reasonable;

(35)    Disclosure of intent and motives for named and unnamed defendant actions;

(36)    Attorney's fees as the Court sees reasonable;

//

//

1

<u>Requests for Relief from Pops McGovern as individual and as agent of United States</u>

2
    (37)       Disclosure of truthful facts stated and implied herein;

3
    (38)       Per contractual rights to performance or substituted services regarding housing,

4
substitute housing accommodations of approx. $1,000/mo. for removal of contractual

obligations (the time the housing contract was breached - approx. 3 years ago - for a

5
total of approx. $36,000 (paid by defendant United States);

6
<u>Requests for Relief from United States</u>

7
    (39)       Injunctive relief (a restraining order against Court Sec. Officers and Librarians

8
- named individuals in the Phillip C. Burton Building and James R. Browning

Courthouse; Restraining Order of 50 feet of named individuals);

9

10
    (40)       Explicit disclosure of alleged facts;
    (41)       Damages, pending FTCA claim(s) filed from April 7th, 2014 – Nov., 2014;

11

12
<u>Request for Relief from Mr. Daniel Waters</u>

13
    (42)       Completion of contractual obligations to repair Plaintiff's credit relating to

14
erroneous Ohio Tax Lien or $200 for substitute services;

15
    (43)       Performance of additional obligation - repair of credit errors due to case

16
matters as asserted herein;

17

18
    (44)       Analysis and submission of damages caused to Plaintiff relating to credit

19
impact of bankruptcy and other impactful circumstances, as may be discovered;

20
    (45)       Attorney's Fees and costs;

21
    (46)       Other relief as may be appropriate.

22

23

24

25

26

27

28

## XI. CONCLUSION

### Social Entrepreneurship, Economics, and the U of C

Plaintiff recalls being lulled into a sense of feeling indebted, swept into a sense of duty to earn less and give more – to pursue social entrepreneurship - a certain responsibility to discard one's own dreams or hopes for the greater good. He recalls being disheartened by the economic system he once looked forward to enjoying.

Time since has been a series of ebbs and flows – realization that while a given endeavor might bring a person hope, the primary duty, without family attached, is to oneself.   Buying a complex good, a product or service that takes significant design, research, marketing, and sales effort to support its sale might be the most generous task possible.  Without such agreements, we spend our time in lines waiting for food, listening to others' talent in direct disregard to pursuing our own.

### A Message to the Court

The Court is instructed that it will not in any way defame, harass, dissuade, or otherwise utilize its personnel (supporting Clerk Staff, Court Security officers, U.S. Attorneys, et al.) to harm or otherwise negatively impact this case.   The Court is reminded that approx. 10 letters pursuant to the F.T.C.A. against Court librarians, Court Security Officers, Judges, and the U.S.M.S. have been filed since April, 2014 relating to personnel in the Phillip C. Burton Building and the James R. Browning Courthouse.

To remedy misbehavior, the Court shall act with nothing but the utmost respect for Plaintiff as well as the reasonable and contextual interpretation of the law, as opposed to the doctrine of "whatever is harmful to Plaintiff shall be done" that has seemingly governed this Court's decision-making process to date.   Further, FRCP 8(e) dictates this Court's behavior relative to construing pleadings in the interest of justice.  Please follow its guidance.

## Hannah and the Farmer's Market

Plaintiff visited the Farmer's Market outside his apartment in Lincoln Park, Illinois in 2008. On one previously penned occasion, Plaintiff recalls watching Hannah, a friend's 2 year old daughter, waddle to and fro in hot pursuit of a dog who was strikingly confused by the child's lack of fear. Plaintiff recalls being amazed, even perplexed by what he witnessed. How and why was this child unafraid?    And what with the diaper-filled plumped-up pants?

Such mesmerizing and perplexing occurrences have filled Plaintiff's life since, a series of young daughters looking to their mothers or fathers for hands to hold, stumbling along shopping for Christmas presents. Perhaps sensory deprivation adheres his soul to what he seeks most - to play with a toddler, to have and hold a daughter or a son.   In juxtaposition to what has been documented within, such a dream is but a distant and unfound reality; published law journals mere snippets of defamatory innuendo, a blanket covering truthful occurrences.

The feeling – of wanting children – doesn't seem to dissipate with age; the aside equally aware of a desire for female companionship, dearth thereof enveloping Plaintiff's mental capacity in a series of "I wonder if she looks good in…" or "I wonder if she'd like to do…"

The realization is merely acknowledgement of what a 41 year old man yearns to have, to hold.

Plaintiff won't soon forget that day, watching Hannah's waddle; won't forget meeting the twins for the first time; won't forget watching a 15-year old play the piano with undeniably well-honed and requisite skill at the San Francisco Conservatory of Music, a revelation of what can be achieved – of what is achieved – by human touch.

Respectfully,

___/s/ Franklin H. Wright___
Franklin H. Wright
frank.wright9@gmail.com
//

## XII.    REQUEST(S) FOR JUDICIAL NOTICE

Pursuant to Fed. Rule of Evid. Code 201, Plaintiff demands U.S.D.C., N.D. Cal. recognize the cases below and those cases contain facts relevant to the filing herein.

Plaintiff seeks leave to combine the Request(s) for Judicial Notice with the Complaint.

| Case No.(s)/Names | Court Location | Date of Filing |
|---|---|---|
| *People of Illinois v. Jesse F. Swartz, V*<br>Representation provided by Breen, Pugh, & Assoc. | Cook County, Illinois | Jan., 2007 |
| *Jesse F. Swartz v. University of Chicago*<br>Case No. 2010-L0-04638<br>Utilized as repository for work; credit-in-lieu and record of time and effort. | Cook Cty; Chicago, IL | Mid. 2010 |
| *U.S.D.C., Illinois Ch. 7 Bankruptcy Filing (Illinois)*<br>09-27024<br>Damage due partially to incident involving Breen, Pugh & Assoc. and also contains anecdotes supporting claims against employers as filed Memoranda. | Chicago, Illinois | March, 2010 |
| *Wright v. Marriott International, et al (California)*<br>CGC-13-536085<br>Initial attempt to file under what Plaintiff believes might be considered Cal. attorney standards. | Superior Court, San Francisco | Dec., 2013 |
| *Wright v. The Gap, Inc. (California)*<br>CGC-14-539824<br>Second attempt to file under Cal. attorney standards - more thoroughly covers request for damages. | Superior Court, San Francisco | June, 2014 |
| *The People of the State of California v. Jesse F. Swartz (tbd Franklin H. Wright)*<br>2480252<br>Defamatory misdemeanor allegations, since dismissed. | 850 Bryant, San Francisco | August, 2014 |
| *City and County of San Francisco v. Jesse F. Swartz (tbd Franklin H. Wright)*<br>CCH-14-575941<br>Retaliation re: 536085 and 9th Cir. exhibits (re: Cal. Government Claims Act and F.T.C.A. claims). | Superior Court, San Francisco | July, 2014 |
| *Franklin H. Wright v. United States of America (U.S. Dept. of Defense, U.S. Dept. of Justice, et al)*<br>13-05994-LB<br>First attempt to file under Cal. attorney standards in U.S.D.C., N.D. Cal. Under Rule 8, suggests United States did harm Plaintiff. | U.S.D.C., N.D. Cal | May, 2014 |
| *Franklin H. Wright v. United States of America (U.S.I.C.H.)*<br>14-00353-RS<br>Contains related claims against U.S. Dept. of Justice regarding Plaintiff's 2009 bankruptcy. See ECF Doc #56, Ex. 1-44 for tortious acts endured from 2013 to 2014 in San Francisco, California. | U.S.D.C., N.D. Cal | January, 2014 |

**EXHIBITS**

Many of the exhibits referenced within this Complaint are located in another U.S.D.C., N.D. Cal. case filing and accessible via the Court's online ECF system.   The table below translates this complaint's numbering system for exhibits to their corresponding case locations.

| Complaint No. | Location & Description | Date |
|---|---|---|
| Ex. 1 | Case No. 14-00353-RS; Doc #56-1  June, 2008 Memo to Edward A. Snyder, former Dean, University of Chicago | June, 2008 |
| Ex. 2 | Case No. 14-00353-RS; Doc #56-2  Sept., 2008 Memo to Edward A. Snyder, former Dean, University of Chicago | September, 2008 |
| Ex. 3 | Case No. 14-00353-RS; Doc #56-3  July, 2009 E-mails to Edward A. Snyder | Various, c. 2009 |
| Ex. 4 | Case No. 14-00353-RS; Doc #56-51  Original Complaint v. U. of Chicago | April 20th, 2010 |
| Ex. 5 | Case No. 14-00353-RS; Doc #56-53 (10 pages)  Excerpts from U of C e-mails | 2008-2010 |
| Ex. 6 & 7 | Case No. 14-00353-RS; Doc #56-52 (4 pages)  U of C Amended Complaint, Cook County (IL)  Case No. 2010-L0-04638 | June, 2010 |
| Ex. 8 | U of C Screenshot – Ethical Marketing of School | c. 2010 |
| Ex. 9 | Case No. 14-00353-RS; Doc #56-49 | Filed in 2014 |

| | | |
|---|---|---|
| | (see last page)<br><br>Plaintiff's A. G. I. (+/- 5%) | |
| Ex. 10 | Case No. 14-00353-RS; Doc #56-39<br>Relief Calculation – Part #1 | @ April, 2014 |
| Ex. 11 | Case No. 14-00353-RS; Doc #56-40<br>Relief Calculation – Part #2 | @ April, 2014 |
| Ex. 12 | Case No. 14-00353-RS; Doc #56-41<br><br>Claims and Law in Support v. Mr. Michael Boskin | |
| Ex. 13 | June 6th, 2014 E-mail from Tom Breen | June, 2014 |
| Ex. 14 | Case No. 14-00353-RS; Doc #86-1<br><br>Time Log from 12/2013-12/2014 | 2013-2014 |
| Ex. 15 | newco presentation (Hospitality)<br><br>Case No. 14-00353-RS; Doc #72-4 | 2008-2011 |
| Ex. 16 | newco Financial Model (R.E.I.T.; Hospitality)<br><br>Case No. 14-00353-RS; Doc #72-5 | 2008-2014 |
| Ex. 17 | Table of Tolling Principles by Party | |





Ex. 8



Ex. # 13

## Citizenship – 2006 to 2014 (Est.)



| 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|

July, 2006 to July, 2007 - Ohio

July, 2007 to May, 2010 - Illinois

May, 2010 to Sept. 20th, 2014 - Ohio

Sept. 20th, 2014 to Jan. 1st, 2015 - California

A summary of applicable tolling principles and dates can be found in the table below.

| Hughes | Discovery Rule; Fraudulent Concealment, Illinois; and CCP §351 | July 2006 – July 2007 as Plaintiff was citizen of Ohio and from June, 2010 to Jan. 2015 as Plaintiff was a citizen of Ohio or California |
|---|---|---|
| Berger Shatz | Discovery Rule; Possible Fraudulent Concealment or Tortious Interference (IL); and CCP §351 | See above |
| Breen & Pugh | Discovery Rule; Fraudulent Concealment (IL) & Tortious Interference (IL); and CCP §351 | See above |
| University of Chicago & Dean Edward Snyder | Discovery Rule; Fraudulent Concealment (IL) & Tortious Interference (IL); and CCP §351 | See above |
| Jeffrey Whitehead & W.S.G.R., P.C. | Discovery Rule; Fraudulent Concealment (IL) & Tortious Interference (IL) and CCP §351 | See above |

Ex. 17